**UNITED STATES of America, Plaintiff,**

v.

**SCIENCE APPLICATIONS INTERNATIONAL CORPORATION, Defendant.**

**Civil Action No. 04–1543 (RWR).**

United States District Court, District of Columbia.

May 15, 2008.

Dodge Wells, Donald J. Williamson, Michael J. Friedman, Michael F. Hertz, J. Chris Larson, U.S. Department of Justice, Washington, DC, for Plaintiff.

Alan I. Baron, Holland & Knight LLP, Washington, DC, John P. Rowley, III, Holland & Knight LLP, McLean, VA, for Defendant.

### MEMORANDUM OPINION
### AND ORDER

RICHARD W. ROBERTS, District Judge.

The United States brought this action against Science Applications International Corporation ("SAIC") under the False Claims Act ("FCA"), 31 U.S.C. § 3729, and District of Columbia common law, alleging SAIC's failure to disclose organizational conflicts of interest ("OCIs") as was required under two contracts that SAIC entered into with the Nuclear Regulatory Commission ("NRC"). SAIC has moved under Federal Rules of Civil Procedure 9(b) and 12(b)(6) to dismiss the government's FCA claims in Counts I and II of the amended complaint to the extent those counts are based on allegations contained in paragraph 89 of the amended complaint. In addition, SAIC has moved for summary judgment on the government's FCA claims and request for damages, as well as the government's breach of contract and quasi-contractual claims. SAIC has also moved to strike the government's Responsive Statement of Genuine Issues and Material Facts.

Because paragraph 89 of the amended complaint meets the heightened pleading requirement of Rule 9(b) when supplemented by the government's answers to interrogatories and its opposition to SAIC's motion to dismiss and motion for summary judgment, SAIC's motion to dismiss the government's FCA claims as they relate to paragraph 89 will be granted only to the extent that paragraph 89 does not specifically identify the potential OCIs at issue. Because the government has presented genuine issues of material fact as to the existence of OCIs and whether SAIC knowingly submitted false claims, SAIC's motion for summary judgment on the FCA and breach of contract claims will be denied. As the government has also presented genuine issues of material fact with regard to its claim for actual damages and statutory civil penalties under the FCA, SAIC's motion for summary judgment as to those damages will be denied. However, because the government has failed to substantiate its claims for the costs of hiring third parties to peer review and complete SAIC's work and to examine NRC rulemaking options, SAIC will be granted summary judgment as to the government's claim for damages flowing from those costs. Because quasi-contractual claims are precluded here since express contracts existed between the parties, SAIC's motion for summary judgment on the government's quasi-contractual claims will be granted.[1] Finally, because SAIC failed to comply with Local Civil Rule 7(m) before filing its motion to strike and the motion is unpersuasive, the motion will be denied.

### BACKGROUND

The NRC is an independent federal agency established to regulate the civil use of nuclear materials. The NRC creates scientific standards for allowing radioactive materials with low levels of contamination to be released to the private sector for recycling and reuse. In 1992 and 1999, the NRC contracted with SAIC to provide technical assistance related to this effort. Under the 1992 contract, SAIC was to provide the NRC with technical assistance related to the recycling and

---

1. Although SAIC's argument about the quasi-contractual claims is contained in its memorandum supporting its summary judgment motion, SAIC makes several loose references to seeking dismissal of the claims. As there is no dispute about the existence of express contracts and judgment as a matter of law is warranted, the wayward references to dismissal will be disregarded.

reuse of radioactive material and was to present an options paper outlining the possible approaches to rulemaking for the release of these materials.[2] The goal of the 1999 contract was to assess regulatory alternatives regarding the release of reusable materials. SAIC's neutrality was critical under both contracts. The contracts explained that SAIC's independence and neutrality would be compromised by any OCI that raised an appearance of bias in its rulemaking recommendations.

SAIC promised in both contracts to forego entering into any consulting or other contractual arrangements with any organization that could create a conflict of interest. The purpose of this clause was to avoid OCIs that were, among others, financial, organizational, or contractual. SAIC warranted upon entering both contracts that it had no OCIs as that term is defined in 41 C.F.R. § 20–1.5402(a). The

regulation defined an OCI as "a relationship ... whereby a contractor or prospective contractor has present or planned interests related to the work to be performed under an NRC contract which: (1) May diminish its capacity to give impartial, technically sound, objective assistance and advice or may otherwise result in a biased work product, or (2) may result in its being given an unfair competitive advantage." 41 C.F.R. § 20–1.5402(a) (1979).[3] SAIC further promised in both contracts to disclose any OCIs it discovered after entering the contract. (*See* Am. Compl. ¶¶ 35, 36.) It repeatedly certified throughout the terms of the contracts that it had no OCIs and would notify the NRC of any changes resulting in an OCI. (*See id.* ¶¶ 41, 42.)

The government alleges that SAIC breached its OCI obligations under the

---

2. SAIC ultimately presented such a paper, referred to as "draft NUREG–1640."

3. Furthermore, the NRC regulations incorporated into the 1992 Contract required SAIC to disclose information concerning situations or relationships that may give rise to OCIs under the following circumstances: ·

(i) Where the offeror or contractor provides advice and recommendations to the NRC in a technical area in which it is also providing consulting assistance in the same area to any organization regulated by the NRC.

(ii) Where the offeror or contractor provides advice to the NRC on the same or similar matter in which it is also providing assistance to any organization regulated by the NRC.

(iii) Where the offeror or contractor evaluates its own products or services, or the products or services of another entity where the offeror or contractor has been substantially involved in their development or marketing.

(iv) Where the award of a contract would result in placing the offeror or contractor in a conflicting role in which its judgment may be biased in relation to its work for the NRC, or would result in an unfair competitive advantage for the offeror or contractor.

Pl.'s Stmt. of Facts ¶ 71 (citing 41 C.F.R. 20–1.5402 at p. 3).

The NRC regulations incorporated into the 1999 Contract required SAIC to disclose situations or relationships that may give rise to organizational conflicts of interest under the following circumstances:

(i) Where the offeror or contractor provides advice and recommendations to the NRC in the same technical area where it is also providing consulting assistance to any organization regulated by the NRC.

(ii) Where the offeror or contractor provides advice to the NRC on the same or similar matter on which it is also providing assistance to any organization regulated by the NRC.

(iii) Where the offeror or contractor evaluates its own products or services, or has been substantially involved in the development or marketing of the products or services of another entity.

(iv) Where the award of a contract would result in placing the offeror or contractor in a conflicting role in which its judgment may be biased in relation to its work for the NRC, or would result in an unfair competitive advantage for the offeror or contractor.

Pl.'s Stmt. of Facts ¶ 72 (citing 48 C.F.R. 2009.570–3(b)(1)).

contracts by engaging in relationships with organizations that created an appearance of bias in the technical assistance and support it provided the NRC. (*See id.* ¶¶ 49–51.) In its amended complaint, the government alleges that SAIC's no-OCI certifications and subsequent requests for payment on the 1992 and 1999 contracts violated the FCA, and brings additional claims under quasi-contract and breach of contract theories.

SAIC has moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the government's FCA claims to the extent they rely upon paragraph 89 of the amended complaint,[4] arguing that the allegations in that paragraph fail to meet the standard for pleading fraud with particularity as is required in Federal Rule of Civil Procedure 9(b). SAIC has also moved for summary judgment, arguing that the government cannot show that SAIC knowingly submitted false claims for payment to the government as required for liability to at-

tach under the FCA, that there was no breach of contract because no undisclosed OCIs existed, that the quasi-contract claims cannot be sustained because express contracts existed between the parties, and that the government cannot prove FCA damages. In addition, SAIC has moved for an order striking the government's Responsive Statement of Genuine Issues and Material Facts, insisting that the government's statement violates Local Civil Rule 7(h) because it is not concise and contains improper argument and immaterial facts.

## DISCUSSION

A party may move under Federal Rule of Civil Procedure 12(b)(6) to dismiss a complaint for failure to state a claim upon which relief can be granted, but such a motion "must be made before pleading." Fed.R.Civ.P. 12(b). Although SAIC moved to dismiss after it filed its amended

---

4. Paragraph 89 states:

Upon information and belief, during the 1992 and 1999 Contracts with NRC, SAIC entered into other relationships that created [OCI] violations under the terms of the 1992 Contract and the 1999 Contract and failed to disclose them to the NRC. Specifically, without limitation to other [OCI] relationships the details of which the United States is still not aware and upon which it seeks discovery, SAIC entered into the following other relationships involving the recycling or reuse of radioactive material or metal:

A) Between 1993 and the present, SAIC entered into multiple contracts and an extended relationship with BNFL and Retech, Inc. to develop, test, market and ultimately patent a Radioactive Scrap Metal processing technology known as the Plasma Hearth Process (PHP). This PHP effort was conducted primarily at SAIC's offices in Idaho—the same location as its efforts for the NRC under the 1992 Contract and the 1999 Contract;

B) SAIC entered into other contracts and relationships with MSC and GTS Duratek in-

volving Radioactive Scrap Metal processing including the National Convention Pilot Project at the Rocky Flats Environmental Technology Site in Colorado and the Small Scale Metal Recycle Project in Oak Ridge, Tennessee;

C) SAIC entered into other relationships with BNFL, SEG, Inc., and GTS Duratek involving the recycling of Radioactive Scrap Metal, including the Advanced Mixed Waste Treatment Project in Idaho;

D) Beginning in 1996, SAIC developed a nationwide "Business Initiative," which sought to expand into the "growing RSM/metal recycle market" by targeting and establishing relationships with all of the major radioactive scrap metal companies like MSC, SEG, Inc., NMI/CMI, Alaron, Inc., M4, BNFL, Babcock & Wilcox, and Parsons Corporation; and

E) From 1994 through 1996, SAIC developed a business plan and provided ongoing assistance in Oak Ridge to Lockheed Martin Energy Systems (LMES) in connection with the Large Scale Metal Recycling Program.

Am. Compl. ¶ 89.

answer, thereby violating the restriction in Rule 12(b), SAIC's motion will be treated initially as a motion for judgment on the pleadings under Rule 12(c). *See Summers v. Howard Univ.*, 127 F.Supp.2d 27, 29 (D.D.C.2000). "If, on a motion under Rule ... 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(d). Matters beyond the pleadings have been presented and considered here. This motion, then, will be treated in turn as one for summary judgment. *See Mulhall v. Dist. of Columbia*, 747 F.Supp. 15, 19 (D.D.C. 1990).

Summary judgment may be granted only where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Burke v. Gould*, 286 F.3d 513, 517 (D.C.Cir.2002). The relevant inquiry "is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that is capable of affecting the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. A genuine issue is one where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.*, as opposed to evidence that "is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. The burden falls on the moving party to provide a sufficient factual record that demonstrates the absence of a genuine issue of material fact.

*See Beard v. Banks*, 548 U.S. 521, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006). "Once the moving party has carried its burden ... [t]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Taylor v. Blakey*, 490 F.3d 965, 972 (D.C.Cir.2007) (internal quotations and citation omitted) (emphasis in original). In considering a motion for summary judgment, all "justifiable inferences" from the evidence are to be drawn in favor of the nonmovant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

"The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion." *Nwachukwu v. Rooney*, 362 F.Supp.2d 183, 189 (D.D.C.2005) (citation omitted). "[T]he moving party bears a heavy burden as courts generally disfavor motions to strike." *Canady v. Erbe Elektromedizin GmbH*, 384 F.Supp.2d 176, 180 (D.D.C.2005) (citing *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.*, 647 F.2d 200, 201 (D.C.Cir.1981)).

## I. MOTION TO STRIKE

SAIC argues that the government's Responsive Statement of Genuine Issues and Material Facts must be stricken because "rather than submitting a 'concise statement of genuine issues' as [Local Civil Rule] 7(h) requires, the government ignored the rules and filed an 85–page statement of 'facts,' including 190 numbered paragraphs that are erroneously presented as 'Additional Material Facts Not In Dispute.' " (Def.'s Mot. to Strike Pl.'s Responsive Stmt. of Genuine Issues and Material Facts ("Def.'s Mot. to Strike") at 1.) SAIC insists that the government's statement contains improper argument, immaterial facts, and is "an attempt to circumvent the page limitation on its brief in opposition." (*Id.*)

■ "In resolving motions to strike, ... the court [should] use[ ] a scalpel, not a butcher knife." *Canady*, 384 F.Supp.2d at 180 (internal quotations and citation omitted). To use such an exacting method would be difficult here, particularly in light of the fact that SAIC urges "[t]he Court [to] disregard the Government's Statement in its entirety[.]" (Def.'s Mot. to Strike at 6.) In support of its motion, SAIC expresses concern that "the Government's Statement ... stands as an impediment to the efficient and just resolution of this case." (Def.'s Reply in Support of Mot. to Strike at 9.) However, by not consulting with the government prior to filing its motion to strike (*see* Pl.'s Opp'n to Def.'s Mot. to Strike at 1–2), SAIC failed to comply with Local Civil Rule 7(m), the very purpose of which is "to promote the resolution of as many litigation disputes as possible without court intervention, or at least to force the parties to *narrow the issues that must be brought to the court.*" *Ellipso, Inc. v. Mann*, 460 F.Supp.2d 99, 102 (D.D.C.2006) (emphasis added). The fact that SAIC believed "that the government would not be willing to resolve the problems ... short of this Court's intervention" (Def.'s Reply in Support of Mot. to Strike at 9) does not change the fact that it was under an obligation to make a "good faith effort ... to narrow the areas of disagreement." LCvR 7(m); *accord Alexander v. FBI*, 186 F.R.D. 185, 186–87 (D.D.C.1999) (noting that although circumstances suggested "that the motion would be opposed, the greater problem involves whether there was a 'good faith effort ... to narrow the areas of disagreement' "). Furthermore, despite SAIC's insistence to the contrary, it "has not demonstrated that it was prejudiced [by the government's statement] ... as reflected by its reply submitted in support of its motion for summary judgment ... prior to filing its motion to strike." *Smith Prop. Holdings v. United States,* 311 F.Supp.2d 69, 78 (D.D.C.2004). (*See, e.g.,* Def.'s Reply in Support of Mot. to Strike at 5, n. 4 ("[A]s SAIC points out *in its Reply Brief,* the government has blatantly mischaracterized the ... evidence[.]") (emphasis added).) Accordingly, because SAIC failed to comply with Rule 7(m) and meet its heavy burden in filing its motion to strike, the motion will be denied.

## II. RULE 9(b) CHALLENGE TO PARAGRAPH 89

SAIC insists that paragraph 89 of the amended complaint fails to comport with Federal Rule of Civil Procedure 9(b) and should be dismissed. "Th[e] [D.C.] Circuit has held that complaints brought under the False Claims Act are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b)." *Allen v. Beta Constr.,* 309 F.Supp.2d 42, 45 (D.D.C.2004) (citing *United States ex rel. Totten v. Bombardier Corp.,* 286 F.3d 542, 551–52 (D.C.Cir. 2002)). Rule 9(b) requires that "[i]n alleging fraud ..., a party must state with particularity the circumstances constituting fraud[.]" Fed.R.Civ.P. 9(b). "Conclusory allegations that a defendant's actions were fraudulent or deceptive do not satisfy Rule 9(b)." *Elemary v. Holzmann,* 533 F.Supp.2d 116, 137 (D.D.C.2008) (citation omitted). "A plaintiff must specifically allege the time, place, and contents of any affirmative misrepresentation." *Id.* (citing *Totten,* 286 F.3d at 552). "By extension, a plaintiff claiming fraud through 'suppression of facts' must identify the facts concealed and/or acts of concealment with particularity." *Elemary,* 533 F.Supp.2d at 137. "In other words, Rule 9(b) requires that the pleader provide the 'who, what, when, where, and how' with respect to the circumstances of the fraud." *Id.* (citation omitted).

■ "Rule 9(b) is not ... to be read in isolation from other procedural canons...."

[T]he requirement of particularity does not abrogate Rule 8 and it should be harmonized with the general directive ... of Rule 8 that the pleadings should contain a short and plain statement of the claim or defense and that each averment should be simple, concise and direct." *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1385–86 (D.C.Cir.1981) (internal quotations and citation omitted). "Thus, while the 'time, place, and contents of the false representations' must be pleaded with specificity in an FCA cause of action, *Totten,* 286 F.3d at 552, 'the simplicity and flexibility contemplated by the rules must be taken into account when reviewing a complaint for 9(b) particularity.'" *Allen,* 309 F.Supp.2d at 46.

While FCA cases in this circuit reveal that "specificity regarding the identities of individual actors is required[,]" *see United States ex rel. El–Amin v. George Washington Univ.,* Civil Action No. 95–2000(JGP), 2005 WL 485971, at *6 (D.D.C. Feb.25, 2005) (discussing cases), "where a complaint covers a multi-year period, Rule 9(b) may not require a detailed allegation of all facts supporting each and every instance of submission of a false claim." *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.,* 238 F.Supp.2d 258, 268 (D.D.C.2002) (citations omitted); *see also El–Amin,* 2005 WL 485971, at *5 ("[T]he complexity and duration of the alleged fraud might relieve some of the burden required by Rule 9(b).").

Here, although the government does not provide "a detailed allegation of all facts" involved in its paragraph 89 allegations, it does provide "specificity regarding the identities" of SAIC's potential OCI relationships[5] and has set forth a sufficiently "detailed description of the specific falsehoods that are the basis for [its] suit." *Totten,* 286 F.3d at 552. Even if, however, paragraph 89 were not sufficiently specific on its face, it has been adequately supplemented by the government's interrogatory responses and the government's opposition to SAIC's motion for summary judgment. "While it is generally understood that the complaint may not be amended by legal memoranda that are submitted as oppositions to motions for dismissal or summary judgment, ... courts have allowed, for Rule 9(b) purposes, a party to supplement its complaint through such legal memoranda ... for the sake of judicial economy." *Shekoyan v. Sibley Int'l Corp.,* 217 F.Supp.2d 59, 73 (D.D.C.2002) (citation omitted), *aff'd,* 409 F.3d 414 (D.C.Cir. 2005); *see also El–Amin,* 2005 WL 485971, at *12 ("[A] complaint alleging fraud that fails to meet the particularity requirement of Rule 9(b) can be cured, and adverse judgment avoided, if the opposition to the motion to dismiss supplies the facts necessary to meet 9(b)'s requirements.").

Although SAIC contends that allowing the government to supplement its amended complaint in the manner described in *Shekoyan* is improper, it does not argue that the government's interrogatory answers and subsequent opposition briefs would inadequately supplement paragraph 89. Here, it is clear that allowing the government to supplement its allegations in paragraph 89 furthers judicial economy. As is discussed below, there are numerous

---

5. To the extent that the government does not specifically name the potential OCIs at issue, *see* Am. Compl. ¶ 89 (alleging that there are "other [OCI] relationships the details of which the United States is still not aware"), those allegations must be dismissed. *See El–Amin,* 2005 WL 485971, at *7 ("Only claims based on the conduct of the fifteen [actors] named in paragraph 34 survive; any claims based on the conduct of unnamed [actors] are dismissed.").

genuine issues of material fact such that SAIC's motion for summary judgment must be denied and this case set for trial. It makes little sense to order the government to file a second amended complaint at this stage, particularly when SAIC "cannot credibly argue that [it is] not now on notice of the charges against [it]." *Allen*, 309 F.Supp.2d at 47. Accordingly, SAIC's motion to dismiss Counts I and II to the extent they are based on the allegations in paragraph 89 will be denied in part.[6]

## III. COUNTS I AND II: FALSE CLAIMS ACT

█ SAIC also moves for summary judgment on the government's False Claims Act counts. The False Claims Act creates liability for one who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government[.]

31 U.S.C. § 3729(a). "The three elements of FCA liability are that (1) defendant submitted a claim to the government; (2) which was false; and (3) which the defendant knew was false." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25, 57 (D.D.C.2007) (internal quotations and citation omitted). SAIC urges that summary judgment in its favor is warranted because the government cannot show that there is a genuine issue of material fact as to any of these three elements or as to damages.

### A. Whether submissions were "claims"

█ The FCA "proscribes only false *claims*, that is, actual demands for money

or property.... [L]iability [attaches] to the claim for payment not to the underlying activity." *United States v. Intrados/Int'l Mgmt. Group*, 265 F.Supp.2d 1, 6 (D.D.C.2002) (emphasis added) (citing *Totten*, 286 F.3d at 551). In other words, "[t]he FCA is not a catchall anti-fraud provision; it only goes after claims that are false, not claims that are submitted while fraud is afoot." *Hockett*, 498 F.Supp.2d at 71 (citation omitted). Where a plaintiff "fails to point to a single, specific false claim or sufficiently detailed description of one, he fail[s] to create a triable issue of fact." *Hockett*, 498 F.Supp.2d at 71 (internal quotations and citation omitted).

There are three types of false claims under the FCA. First, a claim may be "factually false if it invoices for services that were not rendered." *Id.* at 64. Second, it may be legally false because it contains an express false certification-that is, "a claim that falsely certifies compliance with a particular statute, regulation or contractual terms, where compliance is a prerequisite for payment." *Id.* (internal quotations and citation omitted). Third, it may be legally false under an "implied certification theory." *Id.* "The theory of implied certification ... is that where the government pays funds to a party, and would not have paid those funds had it known of a violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent." *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F.Supp.2d 28, 33 (D.D.C.2003).

Neither party contends that invoices submitted for payment by SAIC were either factually false or that they contained

---

**6.** The motion will be granted in part as is discussed in note 5 *supra*.

express false certifications; the issue is whether the government can show that SAIC made *implied* false certifications in submitting its invoices to the NRC. SAIC urges that under *Hockett,* in order for the implied certification theory to apply, the government must show "that compliance with the NRC regulations or the contract OCI clauses was an *explicit condition precedent to payment* under the Contracts." (Def.'s Reply to Opp'n to Mot. for Summ. J. ("Def.'s Summ. J. Reply") at 12 (citing *Hockett,* 498 F.Supp.2d at 68).)

SAIC's assertion is problematic for several reasons. First, *Hockett* states that "[t]he theory of implied false certification ... *typically* applies where ... [a condition] is an explicit condition precedent to payment[.]" 498 F.Supp.2d at 68 (emphasis added). Yet the case *Hockett* cites for the proposition that "the regulation at issue must expressly condition payment on compliance"—*Pogue*—seems to rely upon a Second Circuit decision for the requirement of an express condition. *See Pogue,* 238 F.Supp.2d at 264 (citing *Mikes v. Straus,* 274 F.3d 687, 700 (2d Cir.2001)). The D.C. Circuit, though, has never announced such a requirement. To the contrary, the two primary D.C. Circuit cases addressing the issue suggest that for an implied certification theory to succeed, there must simply be a "withholding of ... information—information critical to the [government's] decision to pay[.]" *United States v. TDC Mgmt. Corp.,* 288 F.3d 421, 426–27 (2002) (emphasizing that "[the defendant] presented no evidence to dispute [a government] [a]dministrator's ... declaration that he would have immediately terminated the contract had he been aware of [defendant's] unreported activities") (internal quotations and citation omitted); *see also United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1376 (D.C.Cir.2000) ("Courts have been ready to infer certification from silence,

but only where certification was a prerequisite to the government action sought."). This rule has been followed in other cases in this district, without mention of an "express condition precedent" requirement. *See, e.g., United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,* 297 F.Supp.2d 272, 282 (discussing *Siewick* and suggesting that a false certification claim would be appropriate only where "the demands for payment furthered the original deceit by helping the wrongdoer obtain money from the government to which he would not otherwise be entitled"); *United States ex rel. Ortega v. Columbia Healthcare, Inc.,* 240 F.Supp.2d 8, 19 (D.D.C.2003) ("[R]ecovery may be had under the FCA for an implied certification where if the government had known of the violation when presented with the claim for payment, it would not have paid the claim."); *Barrett,* 251 F.Supp.2d at 33 ("The implied certification theory essentially requires a materiality analysis. Certification of compliance with the statute or regulation alleged to be violated must be so important to the contract that the government would not have honored the claim presented to it if it were aware of the violation.").

■ Here, the government has presented evidence—which SAIC fails to rebut—that SAIC's no-OCI certifications constituted "information critical to the [government's] decision to pay[.]" *TDC,* 288 F.3d at 426. (*See, e.g.,* Pl.'s Stmt. of Genuine Issues ("Pl.'s Stmt.") Ex. 43, ¶ 10 (Aff. of Stephen M. Pool) ("As Contracting Officer, I would not have requested payments on an invoice had I known that contrary to any one of SAIC's certifications, that SAIC did indeed, have any relationships of the type set forth in the pertinent NRC [OCI] regulation.").) Moreover, as the government highlights, even *Hockett* itself acknowledges that an implied certification

theory can be asserted when the defendant makes a false claim to obtain eligibility for a federal contract and then submits claims impliedly certifying that continued eligibility. 498 F.Supp.2d at 69–70 & n. 33 ("The question is one of eligibility in the first instance; had the government known about the fraud ..., it never would have entered the contract, and no payments would have been made."). In fact, one of the cases the *Hockett* court cites, *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir.2003), found that a defendant's false OCI certifications did render its claims for payment false. *Id.* at 913. In so doing, the *Harrison* court explicitly rejected a defendant's claim that "the falsity of the no-OCI certification was not material to the government's decision to fund [the defendant]." *Id.* at 913–14. Thus, there can be little doubt that "[a] government contractor's failure to disclose an organizational conflict of interest constitutes a false claim under the False Claims Act." *United States ex rel. Ervin & Assocs. v. Hamilton Secs. Group*, 370 F.Supp.2d 18, 51–52 (D.D.C. 2005) (citing *Harrison*, 352 F.3d at 916–17).

### B.  *Whether submissions were "false"*

■ SAIC argues that it would be improper to find that it submitted false claims because, at base, the government cannot prove that SAIC's no-OCI certifications were actually false. The government bears the burden of establishing falsity. *Hockett*, 498 F.Supp.2d at 57.

There are two principal ways an OCI could have existed in this case such that SAIC's no-OCI certifications would be false. First, a potential conflict may have existed if SAIC conducted concurrent work in the same "technical area" or "on the same or similar matter" for both the NRC and an "organization regulated by the NRC." *See* 48 C.F.R. § 2009.570–3(b)(1)(i) and (b)(1)(ii); *see also* note 3 *supra.* Second, a potential conflict could have existed if SAIC was placed "in a conflicting role in which its judgment may have been biased in relation to its work for the SAIC[.]" 48 C.F.R. § 2009.570–3(b)(1)(iv); *see also* note 3 *supra.* SAIC insists that neither of these two OCI scenarios could be found to apply to its relationships with several entities about which the government complains.

### 1.  British Nuclear Fuels, Ltd.

SAIC insists that the government cannot meet its burden of proving that SAIC's relationship with British Nuclear Fuels, Ltd. ("BNFL") created an OCI. SAIC's main two arguments are that the government has not provided evidence showing that BNFL was "an organization regulated by the NRC" (Def.'s Summ. J. Reply at 18–20), and that the government cannot prove bias. (Def.'s Mem. P. & A. in Supp. of Mot. for Summ. J. ("Def.'s Summ. J. Mem.") at 23.)

With regard to whether BNFL was "an organization regulated by the NRC," the government highlights that in a 1999 letter to the NRC, SAIC itself stated that it was "provid[ing] statements of work and other documents that describe the work SAIC has performed and is presently performing for the [NRC] licensees or applicants (including ... BNFL) which comes within the scope of the ... contracts[.]" (*See* Pl.'s Stmt. Ex. 46 at 1.) SAIC retorts that it is "disingenuous" for the government to cite to the letter because SAIC was simply repeating back the language the NRC used to request the information at issue (*see* Pl.'s Stmt. Ex. 45 (NRC's request)) "much in the same way that parties to litigation repeat the language of an interrogatory in their response." SAIC's point seems misplaced, however. Responding to

an interrogatory by simply repeating a question in the form of an answer where that creates an inaccurate response is hardly standard litigation practice. Indeed, here, SAIC stated outright that it was providing information regarding BNFL, an NRC "licensee[ ] or applicant," which came within the scope of SAICs contracts with the NRC. As the government persuasively argues, this evidence raises a genuine issue of material fact as to whether SAIC's relationship with BNFL created an OCI.

Regarding the issue of bias, SAIC underscores the fact that "had Draft NU-REG–1640 been used as the technical basis for a new NRC clearance rule, the new rule would have *decreased* the amount of contaminated materials that could be released to the public." (Def.'s Summ. J. Reply at 21 (emphasis in original).) SAIC cites to several depositions in which NRC officials state that the actual work provided by SAIC was not biased, and indeed constituted the "opposite of a conflict." (*See id.* (citing Def.'s Ex. 4 (Dep. of Robert Meck) at 144–45, 155–58; Def.'s Ex. 6 (Dep. of Carl Paperiello) at 71–71 & Ex. 5 n. 1).) As the government correctly notes, however, "a showing that the conflicting work exhibit *actual* technical bias is not at all required [when] the evidence supports the allegation that SAIC's judgment *may* have been biased." (Pl.'s Opp'n to Mot. Summ. J. ("Pl.'s Summ. J. Opp'n") at 32 (emphasis added).) Indeed, the exact wording of the OCI regulation required SAIC to certify that it did not have a "conflicting role in which its judgment *may* be biased." 48 C.F.R. 2009.570–3(iv). A lack of actual bias apparent from the ultimate work produced is not determinative. What matters is evidence beforehand that SAIC may have been biased. Here, the government has presented evidence that SAIC's relationship with BNFL prior to entering the 1999 Contract had

the potential to create bias (*see, e.g.,* Pl.'s Stmt. Ex. 29 (Dep. of Stephen Turner) at 181–187 (acknowledging that it is "common sense" that it would have been a bad business idea for SAIC to "criticiz[e] a business area" such as SAIC's work for and desired future projects with BNFL)), further making summary judgment unwarranted as to claims related to the BNFL relationship.

### 2. Bechtel Jacobs Company

SAIC insists that the government cannot prove that a conflict existed involving Bechtel Jacobs Company ("BJC") because (1) SAIC's work for BJC was not similar to the work it performed for the NRC; (2) even if the work were similar, BJC was not an NRC licensee; and (3) SAIC was not placed in a position where its judgment may have been biased. (*See* Def.'s Summ. J. Mem. at 23–25.) Both parties have presented adequate evidence so as to render the similarity of the work a genuine issue. (*Compare* Def.'s Summ. J. Mem. Ex. 31 (1/25/06 Expert Report of J. Frazier) at 5–6)("The work performed by SAIC for NRC ... was totally different and distinct from the ... evaluation performed by SAIC ... through ... BJC."), *with* Pl.'s Stmt. ¶ 181 (showing how SAIC copied entire sections of its work for the NRC to present to BJC (citations omitted)). While SAIC urges that any such similarity is immaterial because BJC was not a NRC licensee, the government explains that "whether [BJC] was licensed by the NRC is not at all dispositive of whether SAIC's certifications were false ... [because] two of the four categories [of the OCI regulations] consider advice and assistance provided to 'organization[s] regulated by the NRC,' a classification broader than mere licensure[,]" and that BJC had several plants "that were directly under NRC regulation[.]" (Pl.'s Summ. J. Opp'n at 34 &

n. 4.) The government's point is persuasive, and SAIC fails to respond to it. (*See* Def.'s Summ. J. Reply at 22–23.) Summary judgment that SAIC's relationship with BJC created no conflict is unwarranted.[7]

### 3. Association of Radioactive Metal Recyclers

SAIC contends that the government cannot prove that the relationship with the Association of Radioactive Metal Recyclers ("ARMR") created a conflict, insisting that although Gerald Motl, an SAIC employee, served in a "personal capacity" on ARMR's board of directors, "SAIC was never a member, sponsor, or participant in that short-lived association, and in fact declined every invitation to join." (Def.'s Summ. J. Mem. at 25.) SAIC also urges that the "government was on notice that Mr. Motl was a participant in ARMR and yet it was unconcerned about the possibility of conflict[,]" thereby negating SAIC's FCA liability. (*Id.*)

The government admits that "[i]n its proposal for the 1999 Contract, SAIC explained that ... Motl[ ] 'served a complete term as director' of ARMR[,]" but it argues that "SAIC did not disclose this as an OCI relationship ... [and] it is not enough to simply bury it in the text of a Technical Proposal." (Pl.'s Stmt. ¶ 22 (internal quotations omitted).) The government adds that SAIC's statement regarding Motl's membership "was in the past tense, when, in fact, Mr. Motl was still serving as an ARMR director at the time of the proposal." (*Id.*) Viewing the facts in a light most favorable to the government, it is far from clear that the government knew, or even should have known, that Motl's participation with ARMR could raise conflict concerns. More importantly, however, the existence of government knowledge "is relevant to determining whether [a] defendant lacked the requisite *scienter[,]*" *United States ex rel. Bettis v. Odebrecht Contrs. Of Cal., Inc.*, 297 F.Supp.2d 272, 286 n. 22 (D.D.C.2004) (emphasis in original), *aff'd*, 393 F.3d 1321 (D.C.Cir.2005), not to whether the claim at issue was objectively false. *See also, United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir.2002) ("[T]he government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation."); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1156 (2d Cir.1993) ("[T]he statutory basis for an FCA claim is the defendant's knowledge of the falsity of its claim ... which is not automatically exonerated by any overlapping knowledge by government officials."). Here, both parties have marshaled facts that support their arguments regarding whether SAIC's connection to ARMR was violative of the OCI regulations. "Without making credibility determinations, a task for the factfinder at trial and not for summary judgment, the Court cannot rule[,]" *Chaple v. Johnson*, 453 F.Supp.2d 63, 71 (D.D.C.2006), and SAIC's request for summary judgment as to this claim will be rejected.

### D. *Alaron Corporation*

The government contends that "SAIC provided consulting assistance to the Alar-

---

**7.** Similarly, the government has presented facts creating a genuine issue as to whether SAIC's work for BJC placed SAIC in a position where its judgment may have been biased in relation to its work for the NRC. (*See, e.g.*, Pl.'s Stmt. ¶ 186 (explaining that SAIC's as-

sessment that BJC's release of radioactive material from its plants would result in a "trivial" dose to the public "was precisely one of the issues sought to be determined by the NRC in the 1992 Contract and the 1999 Contract.").)

on Corporation, a company both licensed and regulated by the NRC, in technical areas that were very similar if not identical to the advice that SAIC gave to the NRC[.]" (Pl.'s Summ. J. Opp'n at 26.) SAIC argues that the government cannot prove that the Alaron Corporation relationship created a conflict, noting that "[t]he government's only evidence of SAIC's 'extensive' work for Alaron consists of a single-page 'letter of commitment' responding to an Alaron inquiry." (Def.'s Summ. J. Reply at 23–24.)

In the letter at issue, SAIC states to Alaron that "SAIC's broad range of ... experience with hazardous, radioactive, and mixed waste ... management, treatment and disposal, [and] regulatory compliance ... is an excellent compliment to Alaron's hands-on processing know-how." (*See* Pl.'s Stmt. Ex. 128 at Ex. 3.) SAIC insists that the letter should not be taken out of context—namely, Alaron was to use SAIC's expertise "for purposes of Alaron's submission of a proposal to work as a subcontractor on ... a facility owned and operated by the Department of Energy." (Def.'s Summ. J. Reply at 24.) This point is unavailing, however, because the government also presents evidence showing that SAIC knew that Alaron was regulated by the NRC. (*See, e.g.*, Pl.'s Stmt. Ex. 128 at Ex. 1 (Alaron Proposal to Westinghouse Savannah River Co.), p. 7, sec. A.2 ("ALARON Corporation will be responsible for compliance with all applicable ... Federal ... Regulations, and codes, etc. ALARON will utilize the services of SAIC to ensure compliance with these standards.... [T]he industry standards followed by ALARON include[ ]: [NRC regulations.]").) Moreover, even if the govern-

ment's evidence did not show that SAIC knew that Alaron was regulated by the NRC, the government has also presented facts showing that "SAIC was in a conflicting role because it was advising both the agency contemplating a rule and the commercial entity that stood to profit from the rule." (Pl.'s Summ. J. Opp'n at 27.) Accordingly, SAIC's argument that summary judgment is warranted on the basis that the government cannot show that the Alaron relationship created a conflict is unconvincing.[8]

#### C. *SAIC's knowledge*

■ SAIC insists that even if the government could show that SAIC presented false claims, SAIC did not do so "knowingly" as required under the FCA. Pursuant to the FCA, the government must prove that SAIC "*knowingly* presented a false or fraudulent claim to the Government." *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F.Supp.2d 108, 123 (D.D.C.2007) (internal quotations and citation omitted) (emphasis added). A person acts "knowingly" under the FCA if he:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information.

31 U.S.C. § 3729(b).

■ "The first element of 'knowingly' goes after subjective knowledge, while the second seeks out the kind of willful blindness from which subjective intent can be inferred. As for reckless disregard, it is

---

**8.** SAIC does not present evidence to show an absence of a genuine issue of material fact with regard to the OCI allegations in paragraph 89 of the amended complaint. Thus, to

the extent those allegations survive SAIC's motion to dismiss paragraph 89 as is discussed above, they also survive SAIC's motion for summary judgment.

an extension of gross negligence, or gross-negligence-plus, and is not merely a proxy for subjective intent." *Hockett,* 498 F.Supp.2d at 57 (internal quotations and citation omitted). "Mere negligence cannot support liability under the FCA." *Id.* "Though scienter is often a fact-bound inquiry, summary judgment is appropriate where plaintiff produces no evidence sufficient to support a finding of the requisite scienter." *Id.* at 57–58 (internal quotations and citations omitted).

SAIC argues that "[t]he government cannot point to a single document that shows, or to a person who claims, that SAIC was aware of an OCI related to the NRC Contracts that it failed to disclose." (Def.'s Summ. J. Mem. at 29.) The government contends, however, that "[t]he evidence shows that SAIC had 'actual knowledge' that its various certifications were false ... [and] that SAIC acted in 'reckless disregard' of the truth or falsity" of its no-OCI certifications.[9] (*See* Pl.'s Summ. J. Opp'n at 37.)

▉ In support of its "actual knowledge" claim, the government, primarily relying on the First Circuit case of *United States v. Bank of New England,* 821 F.2d 844 (1987), urges that SAIC should be held liable for the "collective knowledge" of its employees. (*See id.* at 37–40.) Under the "collective knowledge" doctrine, "[c]orporations are liable for the collective knowledge of all employees and agents within (and acting on behalf of) the corporation." *United States v. Philip Morris USA, Inc.,* 449 F.Supp.2d 1, 893–94 (D.D.C.2006). SAIC insists that application of the collective knowledge doctrine to this case would be inappropriate, highlighting that "in *Bank of New England,* ... as the D.C. Circuit has observed, 'corporate knowledge of certain facts was accumulated from the

knowledge of various employees, but the *proscribed intent* (willfulness) depended on the wrongful intent of specific employees.' *Saba v. Compagnie Nationale Air France,* 78 F.3d 664, 670 n. 6 (D.C.Cir.1996) (emphasis added)." (Def.'s Summ. J. Reply at 4.) Yet, SAIC "[tries] to read into this brief footnote [in *Saba* ] more than is warranted." *Phillip Morris,* 449 F.Supp.2d at 896 n. 34 (citing *Saba,* 78 F.3d at 670 n. 6). Indeed, "[i]n light of the complexity and confusion in the law on [the collective knowledge doctrine], it is hard to believe that this somewhat Delphic footnote will bear the weight which Defendant[ ] place[s] on it." *Id.* Thus, although SAIC urges otherwise, "it is both appropriate and equitable to conclude that a company's fraudulent intent may be inferred from all of the circumstantial evidence including the company's collective knowledge." *Id.* (citing *Saba,* 78 F.3d at 668).

Here, the government has provided sufficient evidence to suggest more than "individual acts of negligence on the part of employees." *Saba,* 78 F.3d at 670 n. 6. (*See generally* Pl.'s Summ. J. Opp'n at 38–39.) Yet even if the application of the collective knowledge doctrine were inappropriate here, the government has still provided sufficient evidence to survive summary judgment as to the FCA scienter requirement. As was explained by the *Harrison* court in response to a corporate defendant's insistence that the district court could not "piece together knowledge of more than one of its employees to find that the corporation knowingly ... submit[ted] the false no-OCI certification[,]"

> [w]e need not adopt the 'collective knowledge' doctrine as ... the government espouse[s] it ... because we are not cobbling together pieces of 'innocent' knowledge to find the requisite scienter.... [T]he issue of material impor-

---

**9.** The government does not allege that SAIC acted with "deliberate ignorance."

tance ... [is] whether there was at least one ... employee who knew or should have known that [the defendant] was submitting a bid seeking government funds and that this bid was tainted by an OCI.

*Harrison,* 352 F.3d 908, 918–19 & n. 9; *accord Fago,* 518 F.Supp.2d at 123–124 (D.D.C.2007) (relying upon *Harrison*'s "at least one" rule to find that plaintiff raised a genuine dispute of fact regarding whether a corporation's certifications were knowingly false). *See also Grand Union Co. v. United States,* 696 F.2d 888 (11th Cir.1983) (holding that a corporation could be held liable under the FCA even if the certifying employee was unaware of the wrongful conduct of other employees).

In this case, the government has certainly presented evidence suggesting that there was at least one SAIC employee who knew that SAIC was bidding for the NRC Contracts despite having OCIs. (*See, e.g.,* Pl.'s Stmt. Ex. 31 (Dep. of Gerald Motl) at 20–24 (discussing his involvement with ARMR during the preparation and submission of SAIC's proposal for the 1999 Contract); *see also,* Pl.'s Stmt. Ex. 28 (Aff. of Alex Murray) at ¶ 18 (stating that he urged management to address OCI concerns "earlier in the bidding process")). Furthermore, the government has also provided evidence, although wholly unnecessary to the scienter determination, from which a jury could infer that SAIC acted recklessly when it made its multiple no-OCI certifications. (*See, e.g.,* Pl.'s Stmt.

Ex. 28 (Aff. of Alex Murray) at ¶ 18.) [10] Thus, the government's evidence is sufficient to raise a genuine dispute of fact regarding whether SAIC's no-OCI certifications were knowingly false.

### E. *Damages*

■■■ SAIC also argues that it is entitled to summary judgment because even if the government can prove that SAIC knowingly submitted false claims, the government cannot prove that it suffered damages. (*See* Def.'s Summ. J. Mem. at 35–43.) "As an initial matter, it is important to note that the FCA provides for two types of liability." *Fago,* 518 F.Supp.2d at 120 (citing *United States ex rel. Schwedt v. Planning Research Corp.,* 59 F.3d 196, 199 (D.C.Cir.1995)). "First, the submitter of a false claim or statement is liable for a civil penalty, regardless of whether the submission of the claim actually causes the government any damages." *Id.* (internal quotations omitted). Thus, as the government correctly notes, it "need not prove that the alleged false statements caused the Government any actual damages in order to recover statutory civil penalties under the FCA." (Pl.'s Summ. J. Opp'n at 41 (quoting *United States ex rel. Fago,* 518 F.Supp.2d at 120).)

■■■ "The second form of liability is for damages actually caused [to] the Government because of the submission of the false claim. To recover for these damages, Plaintiff must prove causation—specifical-

---

**10.** "In my years of employment with SAIC, I observed that SAIC's corporate philosophy was to pursue new contract opportunities aggressively, and to consider organizational conflict of interest ('[OCI]') issues later. This policy was easily observable through conversations and meetings with management in SAIC's various field offices. I communicated to SAIC management ... that they must deal with [OCI] concerns earlier in the bidding process, and in a more defined and consistent

way. I was present at staff and section meetings where other SAIC personnel communicated the same [OCI] concerns. I observed that in a number of instances, my name was placed on SAIC proposal documents when I had no idea that proposals were being made or even considered. In other instances, I was expected to report for work on SAIC projects when I ... had [not] participated in a conflict of interest checking process." *Id.*

ly, that the Defendant caused the Government to pay claims because of the alleged false statements." *Fago*, 518 F.Supp.2d at 120 (internal quotations and citations omitted). Under the D.C. Circuit's proximate cause standard, "a submitter of a false claim should be liable only for those damages that arise because of the falsity of the claim, *i.e.*, only for those damages that would not have come about if the defendant's misrepresentations had been true." *Schwedt*, 59 F.3d at 200; *see also United States ex rel. Purcell v. MWI Corp.*, 520 F.Supp.2d 158, 178 (D.D.C.2007) ("Ultimately, damages are measured based on 'what the government would have paid out had it known of the information that [the defendant] omitted.'") (quoting *TDC*, 288 F.3d at 428).

▮ Here, the government claims that the evidence establishes that SAIC's no-OCI certifications were the proximate cause of the NRC's decision to pay SAIC's invoices, specifically highlighting that the "NRC Contract Specialist who formally requested payment of SAIC's vouchers relied entirely upon SAIC's certifications, and *would not have requested payment had he known* that ... SAIC did indeed have undisclosed OCI Relationships." (Pl.'s Summ. J. Opp'n at 42 (citing Pl.'s Stmt. ¶ 89 (citing Ex. 43, ¶ 10 (Aff. of Stephen M. Pool) ("As Contracting Officer, I would not have requested payments on

an invoice had I known that contrary to any one of SAIC's certifications, that SAIC did indeed, have any relationships of the type set forth in the pertinent NRC OCOI regulation.'"))) (emphasis in original).) [11] Although SAIC generally asserts that the government cannot prove that SAIC's work had no value (*see* Def.'s Summ. J. Mem. at 36–39), this point is immaterial because it does not negate the government's proximate cause argument.[12] Thus, the government has raised a triable issue as to its claim for actual damages for the payments it made to SAIC, as well as for statutory civil penalties.

SAIC additionally argues that the government cannot recover $92,705.24 that the NRC paid to a third party to conduct a peer review of SAIC's draft product from the 1992 contract, NUREG1640. In support of its argument, SAIC urges that "[t]hese alleged damages have been satisfied according to the NRC's own rationale for entering into a "No Cost Settlement Termination" of the 1999 Contract." Specifically, SAIC highlights that NRC's Contracting Officer for the 1999 Contract stated, "[t]he no-cost settlement included non-payment of SAIC Invoice Number 5 in the amount of $120,672.57.... This offsets the approximate $100,000 required for future peer review of NUREG 1640." (Def.'s Summ. J. Mem. at 39–40 (quoting "No-Cost Settlement Termination," Def.'s Ex.

11. Notably, Pool's statement nearly mirrors the statements underscored by the D.C. Circuit in *TDC*: "[Defendant] fails to rebut the declarations of [agency] officials that [the agency] relied on [defendant's] ... reports and would not have continued to make payments but for the omissions." 288 F.3d at 428.

12. In SAIC's reply brief, it urges that the government's claim for damages must fail because the government advances "a 'but for' standard that is inapplicable as a matter of law to the facts of this case." (Def.'s Summ. J. Reply at 2 n. 2.) SAIC's insistence is un-

founded for two reasons. First, the standard SAIC insists the government must meet was established in the Fourth Circuit, *see Harrison*, 352 F.3d at 923 (suggesting that a proper measure of damages is the difference between what was paid and what would have been paid absent a conflict), and there is no indication that the D.C. Circuit has adopted this alternative standard. Second, the government does not even rely entirely on a "but for" theory. It presents both "but for" and proximate cause theories. (*See* Pl.'s Summ. J. Opp'n at 42–43.)

15 at 9, 10).) The government fails to account for the money it retained from SAIC for the purpose of a peer review, and does not present any evidence showing why it is entitled to more damages for such a purpose. Accordingly, SAIC is entitled to partial summary judgment as to the government's claims for actual damages flowing from the costs of peer reviewing the NUREG–1640 draft.

■ Next, SAIC argues that the government cannot show that SAIC is liable for the amounts paid to a third-party company, Sanford Cohen & Associates ("SC & A"), to complete NUREG–1640 after SAIC's 1999 Contract was terminated. (*See* Def.'s Summ. J. Mem. at 40.) As SAIC notes, "when a job is incomplete, the government must expend funds to get the work done, and is entitled to claim damages only in the amount of the excess which it pays for the job over what it would have paid had the contractor not defaulted." *Id.* (quoting *Lamb Eng'g & Constr. v. United States*, 58 Fed.Cl. 106, 113 (2003)) (quoting *United States v. Munsey Trust Co.*, 332 U.S. 234, 243, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947)). SAIC insists "that there is no evidence that the NRC's costs to complete NUREG–1640 were any higher because of SAIC's alleged OCI" (Def.'s Summ. J. Mem. at 41), and cites to statements of various individuals to support its contention, including that of NRC representative Cheryl Trottier, who explained that "[t]he original bid that [SC & A] submitted to finalize 1640 was much less than we would have paid SAIC." (Def.'s Summ. J. Mem. Ex. 17 (Int. of Cheryl Trottier) at 46523.) . Notably, though, that same individual also stated that "it's likely that the ultimate cost could have been higher than had we … had SAIC. I don't know." (*Id.; see also* Def.'s Summ. J. Mem. Ex. 37 (Trottier Dep.) at 38 ("[SC & A] exceeded their projection [of

costs to complete the 1999 Contract] by a lot.").) While Trottier's latter statements could be viewed as creating a genuine issue of fact as to whether using SC & A was ultimately more expensive for NRC than had SAIC's contract not been terminated, "the government does not even attempt to defend … [this] categor[y] of damages" (Def.'s Summ. J. Reply at 2 n. 2), and "[a] Party that fails to refute an opposing party's argument on Summary Judgment may be found to have conceded the point." *Hodes v. United States HUD*, 532 F.Supp.2d 108, 117 (D.D.C.2008) (citing *Speaks v. Dist. of Columbia*, Civil Action No. 03–1965(JDB), 2006 WL 5259200, at *4 n. 1 (D.D.C. Apr.6, 2006) ("Defendants' summary judgment motion seized upon these deficiencies in the record, yet plaintiff's opposition papers are silent on the issue, which arguably provides an independent basis for treating defendants' arguments as conceded[.]")). Thus, SAIC will also be granted partial summary judgment as to the government's claim for damages flowing from the costs of replacing SAIC with SC & A.

Finally, SAIC argues that the government cannot show that SAIC is liable for treble the amount that NRC paid to the National Academy of Sciences ("NAS") for its examination of the NRC rulemaking options. (Def.'s Summ. J. Mem. at 42–43.) SAIC points out the NRC "could not even definitively claim that SAIC's alleged OCIs were the cause of the NAS study." (*Id.* at 42 (citing Ex. 37 (Trottier Dep.) at 38) ("It's hard to tell whether or not the NAS study would have occurred in the absence of the issues surrounding the technical basis or not.").) Again, the government fails to present any evidence to refute SAIC's contention, and partial summary judgment will be granted to SAIC as to the government's claim for treble damages for the NAS study.

## IV. COUNTS III AND IV: QUASI–CONTRACT CLAIMS

SAIC also seeks summary judgment on the government's quasi-contract claims—Counts III (unjust enrichment) and IV (payment by mistake)—because "an express contract exists between the parties." (Def.'s Summ. J. Mem. at 44.) The government argues, however, "[c]ourts have regularly approved the United States' pursuit of common law claim[s] for unjust enrichment and payment by mistake in actions brought under the False Claims Act, even when an express contract existed between the parties." (Pl.'s Summ. J. Opp'n at 44 (collecting cases [13]).)

The government is correct, but its point is unavailing. As was noted in *United States ex rel. Purcell v. MWI Corp.*, 254 F.Supp.2d 69 (D.D.C.2003), "at the motion-to-dismiss stage, courts in this district . . . have permitted the government to proceed with claims alleging FCA violations as well as claims for unjust enrichment or pay-ment by mistake." *Id.* at 79 (citing *United States v. Bouchey*, 860 F.Supp. 890, 892–94 (D.D.C.1994)). *Purcell* goes on to emphasize, however, that "courts . . . have granted motions to dismiss an unjust-enrichment claim in light of the existence of an express contract[,]" [14] and that "allegations of an express contract may warrant dismissal of an unjust enrichment claim[.]" *Id.*

■ This case is clearly well beyond the "motion-to-dismiss stage"—discovery has closed and a summary judgment motion is pending—and both parties acknowledge the existence of an express contract. While the government cites several FCA cases in other circuits in which it was deemed appropriate to consider quasi-contractual claims despite an express contract after the motion-to-dismiss stage,[15] it does not appear that the D.C. Circuit has waivered from the rule that "there can be no claim for unjust enrichment when an ex-

---

13. *See, e.g., United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 608 (8th Cir. 1999) (affirming the district court's award of damages under the government's unjust enrichment claim where the government abandoned its action for breach of the express contract at trial); *United States v. United Techs. Corp.*, No. C–3–99–093, 2000 WL 988238, at *4 (S.D.Ohio Mar.20, 2000) ("Even though an express contract exists between the parties, the United States may plead, in the alternative, unjust enrichment, payment by mistake, and breach of contract, along with its claims under the False Claims Act[.]"); *United States ex rel. Costa v. Baker & Taylor, Inc.*, No C–95–1825–VRW, 1998 WL 230979, at *13 (N.D.Cal. Mar.20, 1998) ("Defendants cannot seriously argue that should the court disregard the contracts, plaintiffs could not state a claim under common law."); *United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 918 F.Supp. 1338, 1344 (E.D.Mo.1996) ("[T]he existence of an express contract does not necessarily preclude recovery of theories of unjust enrichment and restitution, or payment under mistake of fact.").

14. *See, e.g., United States v. United Techs. Corp.*, 51 F.Supp.2d 167, 200 (D.Conn.1999) ("The . . . amended complaint state[s] common law, quasi-contractual claims of unjust enrichment and payment by mistake[.] Because these two common law claims are quasi-contractual, they are inappropriate claims where, as here, there is an express contract."); *United States v. EER Sys. Corp.*, 950 F.Supp. 130, 133 (D.Md.1996) ("Because the above common law counts are quasi-contractual[,] . . . they are inappropriate claims when there is an express contract."); *United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F.Supp. 218, 225 (D.Md.1995); *United States v. Hydroaire, Inc.*, No. 94 C 4414, 1995 WL 86733, at *6 (N.D.Ill. Feb.27, 1995) ("While it is true that a plaintiff can plead in the alternative, as the Government suggests, the doctrine of unjust enrichment has no application where, as in this case, a specific contract governs the relationship of the parties.").

15. *See Applied Pharmacy Consultants, Inc.*, 182 F.3d at 608; *United States v. Mead*, 426 F.2d 118, 124 (9th Cir.1970).

press contract exists between the parties." *Albrecht v. Comm. on Employee Benefits of the Fed. Reserve Employee Benefits Sys.*, 357 F.3d 62, 69 (D.C.Cir.2004) (quoting *Schiff v. AARP*, 697 A.2d 1193, 1194 (D.C.App.1997)). Accordingly, SAIC is entitled to judgment as a matter of law on the quasi-contractual theories of recovery, and SAIC's motion as to Counts III and IV will be granted.[16]

## CONCLUSION AND ORDER

Because paragraph 89 of the amended complaint meets the heightened pleading requirement of Rule 9(b) when supplemented by the government's answers to interrogatories and its opposition to SAIC's motion to dismiss and motion for summary judgment, SAIC's motion to dismiss the government's FCA claims as they relate to paragraph 89 will be granted only to the extent that paragraph 89 does not specifically identify the potential OCIs at issue. Because the government has presented genuine issues of material fact as to the existence of OCIs and whether SAIC knowingly submitted false claims, SAIC's motion for summary judgment on the FCA and breach of contract claims will be denied. SAIC's motion for summary judgment as to damages, however, will be granted in part and denied in part, as the government has presented genuine issues of material fact with regard to its claim for actual damages and statutory civil penalties under the FCA, but has failed to substantiate its other claims for damages. Furthermore, because the express con-

tracts existing between the parties here preclude quasi-contractual claims, SAIC's motion for summary judgment on the government's quasi-contractual claims will be granted. Finally, because SAIC failed to comply with Local Civil Rule 7(m) before filing its motion to strike and the motion is unpersuasive, the motion will be denied. Accordingly, it is hereby

ORDERED that defendant's motion [65] to dismiss be, and hereby is, GRANTED IN PART AND DENIED IN PART. Defendant's motion is GRANTED only to the extent that paragraph 89 of the amended complaint does not specifically identify the potential OCIs at issue; the motion is DENIED in all other respects. It is further

ORDERED that defendant's motion [67] for summary judgment be, and hereby is, GRANTED IN PART AND DENIED IN PART. Defendant is DENIED summary judgment as to Counts I and II of the amended complaint. Defendant is GRANTED summary judgment as to the plaintiff's claim for actual damages flowing from the costs of peer reviewing the NUREG–1640 draft, for damages flowing from the costs of replacing SAIC with SC & A, and for treble damages for the NAS study. Defendant is DENIED summary judgment as to all other claims by the government for damages under Counts I and II. Defendant is GRANTED summary judgment as to the Counts III and IV of the amended complaint. Defendant is DENIED summary judgment as to Count V of the amended complaint. It is further

---

**16.** SAIC also urges that it is entitled to summary judgment on Count V of the amended complaint, in which the government alleges that SAIC breached the 1992 Contract "by engaging in conflicting activities and failing to follow the terms and conditions of the [contracts pertaining] to [OCI]." (Am. Compl.¶ 115.) SAIC argues that "[w]ith no OCI, there could have been no breach of the

1992 Contract [and the] breach of contract claim accordingly must be dismissed." (Def.'s Summ. J. Mem. at 44.) As is discussed above, however, there are genuine issues of material fact as to the existence of OCIs and whether SAIC is liable to the government. Thus, Count V will survive summary judgment.

ORDERED that defendant's motion [75] to strike plaintiff's responsive statement of genuine issues and material facts be, and hereby is, DENIED. It is further

ORDERED that defendant's motion [79] for a status conference be, and hereby is, GRANTED IN PART AND DENIED IN PART. Defendant's request for a status conference to resolve its motion for summary judgment and motion to dismiss is DENIED AS MOOT. Defendant's request for a pre-trial conference is GRANTED. The pre-trial conference is SCHEDULED for June 18, 2008 at 9:45 a.m. and the trial is SCHEDULED to begin on July 1, 2008 at 9:15 a.m. A special jury panel is being summoned. If summoned prospective jurors submit requests in advance to be excused, counsel will be notified periodically to come to court to review these requests. Trial will be in recess on Fridays. The parties will be given up until July 31, 2008 to complete their presentations and arguments to the jury.