# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 21, 2010        Decided December 3, 2010

No. 09-5385

UNITED STATES OF AMERICA,
APPELLEE

v.

SCIENCE APPLICATIONS INTERNATIONAL CORPORATION,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-01543)

———

*Theodore B. Olson* argued the cause for appellant. With him on the briefs were *Matthew D. McGill*, *Amir C. Tayrani*, *Ryan J. Watson*, *Richard O. Duvall*, *Jennifer A. Short*, *Lawrence E. Ruggiero*, and *John P. Rowley III*.

*Robin S. Conrad*, *Amar D. Sarwal*, *James J. Gallagher*, and *Susan A. Mitchell* were on the brief of *amicus curiae* the Chamber of Commerce of the United States of America in support of appellant.

*Jessie K. Liu*, *David A. Churchill*, and *Matthew E. Price* were on the brief of *amicus curiae* the National Defense Industrial Association in support of appellant.

*Thomas M. Bondy*, Attorney, U.S. Department of Justice, argued the cause for appellee.  With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Douglas N. Letter*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: SENTELLE, *Chief Judge*, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:  In this case a jury found, among other things, that appellant, a major government contractor, violated the False Claims Act (FCA), 31 U.S.C. § 3729, by seeking payments at the same time it knew it was violating contractual provisions governing potential conflicts of interest.  On appeal, the contractor principally argues that no liability may attach for its claims for payment because its contract nowhere designated compliance with these conflict of interest requirements as express conditions of payment.  As we explain in this opinion, however, requests for payment can be "false or fraudulent" under the FCA when submitted by a contractor that has violated contractual requirements material to the government's decision to pay regardless of whether the contract expressly designates those requirements as conditions of payment.  We nonetheless vacate the judgment as to FCA liability and remand for a new trial because the district court's "collective knowledge" instruction conflicted with the FCA's scienter standard, the proper application of which is critical to ensuring that FCA liability attaches only for false or fraudulent claims and not for accidental or even negligent breaches of contract.

3

**I.**

The Nuclear Regulatory Commission (NRC) is an independent federal agency that regulates the civilian use of nuclear materials. Pursuant to its general authority, the NRC oversees the release into interstate commerce of commercially valuable recycled radioactively contaminated materials from nuclear facilities. Companies wishing to release such materials must obtain an NRC license and comply with license restrictions. Beginning in the mid-1980s, however, the NRC sought to establish standards for unrestricted release by setting contamination levels that were below "regulatory concern." Am. Compl. ¶ 11. After the NRC's initial efforts encountered Congressional and public opposition, the agency commenced new studies aimed at developing scientific criteria that could inform a future rulemaking to set uniform national standards on the recycling and release of radioactive materials.

Appellant Science Applications International Corporation (SAIC), a scientific, engineering, and technology applications company, entered into a contract with the NRC in 1992 to provide technical assistance and expert analysis to support the agency's potential rulemaking. SAIC performed multiple tasks under the contract, delivering several reports, including both a literature review and a regulatory options paper that the NRC published in 1999. In the options paper, SAIC calculated radiological dose assessment estimates for materials recycled and released from nuclear facilities. In 1999, SAIC and the NRC executed a follow-on contract to allow the company to continue its work in support of the agency's rulemaking.

The 1992 and 1999 contracts included several provisions designed to identify and prevent potential conflicts of interest. Because the two contracts are substantially identical for all

purposes relevant to this litigation, we shall refer only to the 1992 contract. SAIC's contract imposed limitations on the company's ability to "work for others" during the contract term. Specifically, SAIC agreed to "forego entering into consulting or other contractual arrangements with any firm or organization, the result of which may give rise to a conflict of interest with respect to the work being performed under [the] contract." If SAIC had "reason to believe with respect to itself or any employee that any proposed consultant or other contractual arrangement with any firm or organization may involve a potential conflict of interest," the contract obliged SAIC to obtain the NRC's prior written approval. The contract also included disclosure obligations that required SAIC to "warrant[] to the best of its knowledge and belief" that it had no "organizational conflicts of interest" and would make "an immediate and full disclosure in writing" if it discovered such conflicts after the contract award. In the event SAIC disclosed a conflict, the contract required it to provide a mitigation strategy, but the NRC retained the right to terminate the contract if doing so was "in the best interest of the government." The contract defined organizational conflicts of interest by reference to NRC regulations, which in turn defined an organizational conflict of interest as follows:

> a relationship . . . whereby a contractor or prospective contractor has present or planned interests related to the work to be performed under an NRC contract which: (1) May diminish its capacity to give impartial, technically sound, objective assistance and advice or may otherwise result in a biased work product, or (2) may result in its being given an unfair advantage.

41 C.F.R § 20-1.5402(a) (1979).

In addition, the contract required SAIC to make several "representations" and "certifications." SAIC certified that its contract award resulted in none of the "situations or relationships" outlined in 41 C.F.R. § 20-1.5403(b) (1979). That regulation, now codified at 48 C.F.R. § 2009.570-3(b), lists the following situations or relationships that give rise to conflicts:

> (i) Where the . . . contractor provides advice and recommendation to the NRC in a technical area in which it is also providing consulting assistance in the same area to any organization regulated by the NRC.
>
> (ii) Where the . . . contractor provides advice to the NRC on the same or similar matter on which it is also providing assistance to any organization regulated by the NRC.
>
> . . . .
>
> (iv) Where the award of a contract would otherwise result in placing the . . . contractor in a conflicting role in which its judgment may be biased in relation to its work for the NRC, or would result in an unfair competitive advantage . . . .

The contract also provided that "[t]he nondisclosure or misrepresentation of any relevant interest may . . . result in the disqualification of the [contractor] for awards[,] or if nondisclosure or misrepresentation is discovered after the award, the resulting contract may be terminated."

During the term of the 1992 contract, SAIC and the NRC agreed to several modifications, and each time the company certified that the modification involved none of the above situations or relationships. SAIC repeated this certification in

the 1999 contract. Critical to the issue before us, the pre-printed payment vouchers that the NRC required SAIC to submit for work performed under the contracts contained no express certifications, nor did anything in either contract expressly condition payment on such a certification.

At an open NRC meeting in October 1999, a member of the public charged that SAIC was involved in projects with for-profit companies that potentially created prohibited organizational conflicts of interest with respect to SAIC's NRC work. Responding to this allegation, the NRC asked SAIC to provide information about the company's other work in the area of nuclear recycling. Based on SAIC's disclosure of its existing contracts with two companies—British Nuclear Fuels, Ltd. ("British Nuclear") and the Bechtel Jacobs Company ("Bechtel Jacobs")—the NRC determined that SAIC had, without proper disclosure, placed itself in potentially conflicting roles. The NRC informed SAIC of this determination and ordered the company to stop working on the 1999 contract. The parties subsequently entered into a no-cost settlement terminating that contract.

The United States brought suit against SAIC, raising two claims under the False Claims Act. First, the government charged SAIC with knowingly submitting false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1) by continuing to submit payment invoices after the conflicting relationships arose. Second, the government alleged that SAIC knowingly made false statements to get false or fraudulent claims paid or approved in violation of 31 U.S.C. § 3729(a)(2) when the company certified to the NRC not only that it had no organizational conflict of interest relationships, but also that it would immediately inform the NRC if such relationships developed. The government also brought a claim for breach of the 1992 contract.

The government's FCA causes of action focused on SAIC's business relationships with contractors participating in a project to decommission and decontaminate buildings at a Department of Energy (DOE) site in Oak Ridge, Tennessee. DOE contracted with British Nuclear in 1997 to work on this project, and British Nuclear then engaged SAIC to serve as a subcontractor. Although work performed at DOE's facilities was subject only to DOE oversight, the government argued that SAIC's relationship with British Nuclear created a potential conflict because the project involved the recycling and release of radioactive materials that would become subject to NRC regulation after leaving the DOE facility and entering into interstate commerce. In addition, one of British Nuclear's other subcontractors on the project, its wholly-owned subsidiary Manufacturing Science Corporation (MSC), was licensed under NRC standards by the state of Tennessee. In 1999, SAIC also performed consulting work for Bechtel Jacobs, another contractor DOE employed on the Oak Ridge project. SAIC helped Bechtel Jacobs with a dose assessment and performed a cost-benefit analysis regarding the recycling of radioactively contaminated materials from the site. The government contended that SAIC's work for Bechtel Jacobs closely overlapped with the company's work for the NRC, as illustrated most starkly by the allegation that a company employee copied material from a report prepared for the NRC and pasted it into one for Bechtel Jacobs.

Beyond SAIC's work relating to DOE's Oak Ridge decommissioning and decontamination project, the government alleged that SAIC possessed other undisclosed potential conflicts. For example, the government pointed out that SAIC Vice President Gerald Motl participated in the company's work for the NRC while at the same time serving as an officer and board member of the Association of Radioactive Metal Recyclers (ARMR), a trade association

that advocated for national regulatory standards governing the reuse and recycling of radioactive materials.

SAIC moved for summary judgment on the government's FCA and breach of contract claims, which the district court denied. In doing so, the district court rejected SAIC's argument that the government failed to present evidence that the company's submissions for payment qualified as false claims under the FCA. *See United States v. Science Applications Int'l Corp.* ("*Science Applications I*"), 555 F. Supp. 2d 40, 49–51 (D.D.C. 2008). Although the district court recognized that SAIC's payment invoices themselves made no factually false statements about the services performed and contained no false express certifications of compliance with legal requirements, it nonetheless concluded that the government could proceed on a theory of "implied false certification" because it had presented unrebutted evidence that SAIC's allegedly false certifications of compliance with no-conflict requirements "constituted 'information critical to the [government's] decision to pay[.]' " *Id.* at 50 (quoting *United States v. TDC Mgmt. Corp.* ("*TDC II*"), 288 F.3d 421, 426 (D.C. Cir. 2002) (alterations in original)). In so holding—and setting the stage for the central issue before us—the court rejected SAIC's argument that the implied certification theory requires the government to show that compliance with the contractual conflict of interest provisions is an express condition precedent to the receipt of payment. *See Science Applications I*, 555 F. Supp. 2d at 49–51. The district court also found that the government had offered sufficient evidence to create triable issues as to whether SAIC submitted false claims and made false statements in support of those claims "knowingly," as well as whether the government had suffered actual damages as a result of the alleged false claims and statements. *See id.* at 54–56.

Following a four-week trial, the jury found SAIC liable under FCA sections 3729(a)(1) and 3729(a)(2) and for breach of its 1992 NRC contract. Specifically, the jury determined that SAIC had "knowingly presented or caused to be presented sixty false or fraudulent claims for payment or approval by the government" and had "knowingly made, used, or caused to be made or used seventeen false records or statements to get a false or fraudulent claim paid or approved by the United States government." *See United States v. Science Applications Int'l Corp.* ("*Science Applications II*"), 653 F. Supp. 2d 87, 94 (D.D.C. 2009). Based on the district court's instruction, the jury concluded that the government suffered FCA damages of $1,973,839.61—the full amount of payments made by the government for the claims the jury concluded were knowingly false. Pursuant to FCA section 3729(a), the district court then trebled this amount and added an additional $577,500 in civil penalties. As to the government's breach of contract claim, the jury awarded only $78. The district court entered final judgment in the amount of $6,499,096.83.

SAIC moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and in the alternative sought a new trial under Rule 59(a). *See id.* at 92. As is relevant to this appeal, SAIC argued (1) that the government failed to prove that the company submitted false claims under an implied certification theory because the record contained no evidence that payment under the contract was expressly conditioned on SAIC's compliance with organizational conflict of interest obligations, (2) that the evidence precluded the jury from finding, as it did, that SAIC acted "knowingly" under the FCA when it submitted false claims and statements because SAIC's belief that it had no conflicts as defined by the applicable contractual provisions and regulations was reasonable, (3) that various jury instructions were erroneous

and prejudicial, including an instruction that the jury could find that SAIC possessed knowledge based on the "collective knowledge" of its employees, and (4) that the government failed to prove that it suffered any damages from SAIC's false claims, and in the alternative that the district court's damages instruction was erroneous and prejudicial. *See id.* at 95–99, 102–04, 107–09.

The district court rejected each argument. With respect to implied certification, the court reiterated its earlier holding that this theory of liability has no express condition precedent requirement. *Id.* at 102–03. The court therefore concluded that its instruction to the jury that "[a] claim for payment or a statement made in order to get payment is false if there is a withholding of information that is critical to the government's decision to pay" accurately stated the law of this circuit. *Id.* at 103. The court also found sufficient record evidence to support the jury's determination that SAIC's false representations that it had no conflicts of interest were critical to the government's decision to pay. In support, it pointed to testimony by NRC and SAIC employees describing the importance of the company's organizational conflict of interest obligations to the overall contract and indicating that the NRC would have withheld payments under the contract had it been aware of SAIC's undisclosed potential conflicts of interest. *Id.* As to scienter, the district court concluded that the record contained sufficient evidence to have allowed the jury to infer that SAIC's false claims and statements were made knowingly, either on the basis of actual knowledge of undisclosed organizational conflicts or as a result of reckless disregard for or deliberate ignorance of the truth. *Id.* at 96–99. In particular, the court found that "SAIC knew that it had relationships with entities . . . that were subject to the regulations of the NRC, regardless of whether these entities were doing other work for DOE excluded from the NRC's

regulatory authority." *Id.* at 97. The court also found reasonable the government's use of a "collective knowledge" theory to help establish scienter, explaining that its instruction was appropriate "because the jury could have properly inferred SAIC's fraudulent intent from its collective knowledge." *Id.* at 98–99. Finally, the district court upheld the jury's FCA damages award and rejected SAIC's challenge to the instruction. Under the government's theory of proximate causation, the court explained, had the NRC known about SAIC's organizational conflicts, it would have made no payments whatsoever for the consulting advice and technical assistance it received. Accordingly, the court concluded, the actual value of SAIC's work was "irrelevant." *See id.* at 108–09.

SAIC now appeals, seeking judgment as a matter of law with respect to liability on all causes of action and with respect to FCA damages. Alternatively, it urges us to vacate the district court's judgment and remand for a new trial on all claims. In support, SAIC reasserts each of the arguments discussed above and objects to various other jury instructions, as well as to the constitutionality of the damages award under the Eighth Amendment's Excessive Fines Clause.

## II.

As the False Claims Act existed at the time of the conduct giving rise to this litigation, the statute imposed liability on any person who

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or

statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. § 3729(a)(1)–(2) (2008). The FCA defines claim broadly to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded." *Id.* § 3729(c). The key statutory terms "knowing" and "knowingly" are in turn defined to include a defendant's "actual knowledge," "deliberate ignorance," or "reckless disregard" of the truth or falsity of information in the defendant's claim for payment or statements made to get such claims paid. *Id.* § 3729(b).

Following trial in this case, Congress amended the FCA by enacting the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617. In response to SAIC's post-trial motions in the district court, the government argued that the amended version of the statute applies retroactively. Disagreeing, the district court concluded that "FERA has no impact on the present action." *See Science Applications II*, 653 F. Supp. 2d at 107. On appeal, although the government still maintains that the district court erred by failing to give retroactive effect to the 2009 amendments, it nonetheless assures us that the issue "has no bearing on the outcome of this case." Appellee's Br. 53. Taking the government at its word, we shall assume the correctness of the district court's decision on this point and henceforth refer only to the FCA's pre-2009 language.

"False claims" under the FCA take a variety of forms. In the paradigmatic case, a claim is false because it "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never

provided." *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001). Here, the government's case relies on the so-called "certification theory" of liability, or alternatively "legally false certification." *See id.* at 696–97. Under this theory, a claim for payment is false when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term. *See id.* at 696. False certifications can be either express or implied. Courts infer implied certifications from silence "where certification was a prerequisite to the government action sought." *United States ex. rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000).

This circuit has endorsed the implied certification theory, albeit implicitly. *See id.*; *United States. v. TDC Mgmt. Corp.* ("*TDC I*"), 24 F.3d 292, 296–97 (D.C. Cir. 1994) (allowing the government to bring an FCA claim based on information omitted from a company's progress reports). Although SAIC calls the implied certification theory a "novel, judicially crafted expansion of the FCA," Appellant's Br. 23, its argument actually assumes the theory's validity and instead seeks to limit its scope. Specifically, SAIC contends that liability may attach under the implied certification theory "*only* where a statute, regulation, or contractual provision makes compliance with a requirement an *express* condition precedent to payment." *Id.* By contrast, the government argues—and the district court agreed—that a government contractor runs afoul of the FCA by submitting claims for payment while knowing that it violated contractual provisions that are *material* to the government's decision to pay. *See Science Applications I*, 555 F. Supp. 2d at 49–50.

According to the government, we can resolve this case in its favor without deciding whose theory of implied

certification is correct. Its two arguments in support of that proposition, however, are unconvincing.

The government first points to the jury's finding that SAIC made seventeen express false statements of compliance with its contractual conflict of interest obligations, contending that "[t]hese express . . . representations are plainly sufficient in and of themselves to give rise to [FCA] liability." Appellee's Br. 23. This argument rests on a misunderstanding of the FCA's structure. Knowingly false statements are indeed separately actionable under FCA section 3729(a)(2), but only if the contractor used the statements "for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.' " *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008) (quoting 31 U.S.C. § 3729(a)(2)); *see also United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003) (en banc) ("Although § 3729(a)(2) prohibits the submission of a false record or statement, it does so only when the submission of the record or statement was done in an attempt to get a false claim paid. There is no liability under [the FCA] for a false statement unless it is used to get a false claim paid."). Therefore, as the district court recognized, because the actual claims for payment submitted by SAIC were accurate reports of services rendered that made no reference to whether the company had complied with organizational conflict of interest requirements, and because the government has never argued that SAIC's separate express contractual certifications were themselves "request[s] or demand[s] for money" so as to fall within the statute's definition of "claims," *see* 31 U.S.C. § 3729(c), the government must prove that SAIC's claims for payment were impliedly false for either FCA cause of action to succeed. *See Science Applications I*, 555 F. Supp. 2d at 49–50 ("Neither party contends that invoices submitted for payment by SAIC were either factually false or that they

contained express false certifications; the issue is whether the government can show that SAIC made *implied* false certifications in submitting its invoices to the NRC.").

Second, the government believes that even if SAIC's narrower version of implied certification is correct, the government's evidence satisfies that standard because federal law makes compliance with conflict of interest obligations an express condition precedent to NRC contract awards and hence to the receipt of payments under those contracts. The NRC's legal responsibility to evaluate and avoid (or at least mitigate) potential conflicts of interest before entering into contracts certainly helps demonstrate the importance of honest and complete conflict of interest disclosures to the agency. But the statute the government refers to, 42 U.S.C. § 2210a(a)–(b), imposes obligations only on the NRC and nowhere requires that, in order to be eligible for payment, an NRC contractor must inform the agency if it has developed any potential conflicts of interest.

To resolve this case, we must therefore decide whether an FCA plaintiff may state a cause of action against a federal contractor who fails to disclose the violation of a contractual condition that is material to the government's decision to pay where, as here, that condition is not an express prerequisite to payment. Both parties argue that this question is controlled by circuit precedent. Both are wrong.

SAIC insists that we adopted an express condition precedent requirement in *Siewick*, where we held that "false certification of compliance with a statute or regulation cannot serve as the basis for [an FCA action] unless payment is conditioned on that certification." 214 F.3d at 1376. But SAIC's interpretation divorces *Siewick* from its facts. In that case, a *qui tam* relator—i.e., a private FCA plaintiff—alleged

that a government contractor submitted a false claim by seeking payment while one of its officers was in violation of a criminal statute, 18 U.S.C. § 207, that prohibits "revolving door" abuses by former government employees. The contract in *Siewick* made no mention of section 207, so in sharp contrast to the facts of this case, compliance with the legal requirement the defendant supposedly violated was never recognized as a contractual obligation. *See Siewick*, 214 F.3d at 1376 ("Siewick points to nothing suggesting that [the contractor] was required to certify compliance with [section] 207 as a condition of its contract."). As a result, we had no need in *Siewick* to resolve the question we face here, which involves a government contract that did require the contractor not only to warrant that it had no organizational conflicts of interest as defined by applicable regulation, but also to immediately disclose if such conflicts arose during the course of its performance under the contract.

For its part, the government thinks that we endorsed its theory of implied certification in *TDC II*. There, we found "culpable" a company that failed to disclose in progress reports to the government that it violated the terms of a program by taking a financial position rather than serving as an impartial ombudsman between participating companies and private investors. *See* 288 F.3d at 422, 426. To be sure, as the government points out, we favorably quoted the proposition that " '[t]he withholding of . . . information . . . critical to the decision to pay [] is the essence of a false claim.' " *Id.* at 426 (quoting *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 434 (1994)). We said this, however, only to explain our refusal to review an error the defendant failed to raise in the district court. In determining that no " 'plain miscarriage of justice' " would flow from our enforcing the defendant's waiver, *id.* at 425 (quoting *Hormel v. Helvering*, 312 U.S. 552, 558 (1941)), we had no need to

determine the proper scope of the implied certification theory. Indeed, neither party in *TDC II* even briefed the question of whether the implied certification theory requires the identification of an express condition precedent to payment before liability can attach. In other words, nothing in *TDC II* resolves the issue before us.

Thus untethered by precedent, we must determine the proper scope of the implied certification theory. According to SAIC, a claim can be false under the implied certification theory only if the government contractor violates legal requirements that are *expressly* designated as preconditions to payment. Of course, nothing in the statute's language specifically requires such a rule, and we fear that adopting one would foreclose FCA liability in situations that Congress intended to fall within the Act's scope. *Cf.* S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 (stating the position of the Senate Judiciary Committee that claims for payment for "goods or services . . . provided in violation of contract terms" constitute false claims under the Act). For example, under SAIC's theory, no FCA liability would attach where a government contractor (1) knows that it violated a contractual requirement, (2) recognizes that compliance with that requirement is material to the government's decision to pay (even though the contract nowhere formally identifies the condition as a payment prerequisite), and (3) submits claims for payment that omit any mention of the requirement while knowing that were the violation disclosed, no payment would be forthcoming. Under this scenario, the contractor would escape FCA liability because the absence of an express condition precedent to payment would prevent the fact-finder from judging the company's claim to be false despite the contractor's knowledge that its ability to receive payments from the government depended on withholding information

about its non-compliance with a key contractual provision. We decline to create such a counterintuitive gap in the FCA by imposing a legal requirement found nowhere in the statute's language.

Instead, we hold that to establish the existence of a "false or fraudulent" claim on the basis of implied certification of a contractual condition, the FCA plaintiff—here the government—must show that the contractor withheld information about its noncompliance with material contractual requirements. The existence of express contractual language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality, but it is not, as SAIC argues, a necessary condition. The plaintiff may establish materiality in other ways, such as through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue.

The logic of our conclusion is perhaps best illustrated by way of an example freed from the complexities of this case. Consider a company that contracts with the government to supply gasoline with an octane rating of ninety-one or higher. The contract provides that the government will pay the contractor on a monthly basis but nowhere states that supplying gasoline of the specified octane is a precondition of payment. Notwithstanding the contract's ninety-one octane requirement, the company knowingly supplies gasoline that has an octane rating of only eighty-seven and fails to disclose this discrepancy to the government. The company then submits pre-printed monthly invoice forms supplied by the government—forms that ask the contractor to specify the amount of gasoline supplied during the month but nowhere require it to certify that the gasoline is at least ninety-one octane. So long as the government can show that supplying

gasoline at the specified octane level was a material requirement of the contract, no one would doubt that the monthly invoice qualifies as a false claim under the FCA despite the fact that neither the contract nor the invoice expressly stated that monthly payments were conditioned on complying with the required octane level.

Stripped of its intricacies, the government's case against SAIC is no different. In our hypothetical, the government contracted to purchase gasoline of a certain octane, and here the government contracted to buy conflict-free advice and technical assistance. Just as the claims for payment for nonconforming gasoline were false, here the claims for nonconforming counseling and technical assistance were false so long as the government can establish that conflict-free services were a material condition of the contract.

Although the proper scope of the implied certification theory is somewhat unsettled in the circuits, the Tenth Circuit employs the same materiality approach that we now adopt. *See United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010) ("[F]alse certification— regardless of whether it is implied or express—is actionable under the FCA only if it leads the government to make a payment which, absent the falsity, it may not have made."); *id.* at 1170 (concluding that the *qui tam* plaintiff successfully stated an FCA claim by alleging regulatory violations that "also constituted material breaches of . . . contractual obligations"); *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531–32 (10th Cir. 2000) (holding that a company's monthly invoices for photography services were false because the company implicitly certified that it met contractual obligations to recover and dispose of trace silver according to Environmental Protection Agency guidelines). The Ninth Circuit has likewise held that "[i]mplied false certification

occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).

By contrast, the Second Circuit has recognized an express condition precedent requirement for implied certification—although it did so in a substantially different situation that, as in *Siewick*, involved the violation of no contractual requirement. *See Mikes*, 274 F.3d at 700. Indeed, the Second Circuit largely confined its reasoning to claims by medical providers under Medicare guidelines, as the court worried that broad application of the FCA in that setting would operate as an inappropriately "blunt instrument to enforce compliance with all medical regulations." *Id.* at 699–700; *see also United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1177 (9th Cir. 2006) (recognizing that "the *Mikes* court was dealing with the Medicare context, to which the court specifically confined its reasoning"). Given the context-specific setting of the Second Circuit's decision, its concerns have no applicability to the case before us, which involves SAIC's alleged violation of regulatory requirements actually incorporated into its contract and which implicates none of the federalism concerns involved in *Mikes*. True, the Second Circuit has subsequently applied the *Mikes* standard outside the Medicare context, *see United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 115 (2d Cir. 2010), *cert. granted*, 2010 WL 3116440 (U.S. Sept. 28, 2010) (No. 10-188), but we are unaware of any decision in that circuit rejecting an FCA claim where, as the government alleges here, the defendant sought payment after knowingly violating a material requirement of its contract.

Even though we have rejected SAIC's effort to cabin the implied certification theory, we fully understand the risks created by an excessively broad interpretation of the FCA. As SAIC compellingly points out, without clear limits and careful application, the implied certification theory is prone to abuse by the government and *qui tam* relators who, seeking to take advantage of the FCA's generous remedial scheme, may attempt to turn the violation of minor contractual provisions into an FCA action. In our view, however, instead of adopting a circumscribed view of what it means for a claim to be false or fraudulent, this very real concern can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements. In the following pages, we discuss each of these requirements and explain why record evidence of materiality and scienter leads us to affirm the district court's denial of SAIC's motion for judgment as a matter of law on the government's FCA claims, as well as on the government's breach of contract claim.

### *Materiality*

To establish FCA liability under an implied certification theory, the plaintiff must prove by a preponderance of the evidence that compliance with the legal requirement in question is material to the government's decision to pay. By enforcing this requirement rigorously, courts will ensure that government contractors will not face "onerous and unforeseen FCA liability" as the result of noncompliance with any of "potentially hundreds of legal requirements" established by contract. Appellant's Reply Br. 12. Payment requests by a contractor who has violated minor contractual provisions that are merely ancillary to the parties' bargain are neither false nor fraudulent.

In this case, however, record evidence could have allowed the jury to conclude that the contract's conflict of

interest provisions were far from minor. As the district court explained, "[n]umerous witness[es] from both the NRC and SAIC testified that the [organizational conflict of interest] obligations in SAIC's contracts with the NRC were important to the overall purpose of the contract." *Science Applications II*, 653 F. Supp. 2d at 103. NRC contracting officers and specialists also testified that had they been aware of SAIC's apparent or actual conflicts, such as its relationships with British Nuclear and Bechtel Jacobs, they would not have awarded the two contracts, nor would they have made payments under those contracts. *Id.*

### *Scienter*

Strict enforcement of the FCA's scienter requirement will also help to ensure that ordinary breaches of contract are not converted into FCA liability. *Cf. Shaw*, 213 F.3d at 532–33 (endorsing the implied certification theory and explaining that the Act's scienter requirement limits liability to cases where the contractor knew its certification of compliance was false). For example, FCA section 3729(a)(1) imposes liability only when a person "knowingly presents, or causes to be presented . . . a false or fraudulent claim." Establishing knowledge under this provision on the basis of implied certification requires the plaintiff to prove that the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay. If the plaintiff proves both, and does so based on the proper standard for knowledge— which as we explain below excludes "collective knowledge," *see infra* Part III—then it will have established that the defendant sought government payment through deceit, surely the very mischief the FCA was designed to prevent. *Cf. Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (explaining that in adopting the FCA, "Congress wrote expansively . . . 'to reach all types of

fraud, without qualification, that might result in financial loss to the Government' " (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968))).

In this case, having challenged the materiality theory for implied certification, SAIC never addresses whether the record is sufficient to support a jury verdict that it knew adherence to contractual conflict of interest requirements was critical to the government's decision to pay. Instead, SAIC vigorously argues that the evidence was insufficient to support the jury's conclusion that whatever certifications of compliance it did make were false. According to SAIC, it reasonably believed that its work with DOE contractors posed no potential conflicts and led to none of the "situations or relationships" described in NRC regulations. *See* 41 C.F.R. § 20-1.5403(b) (1979). In support, SAIC points to the existence of a long-recognized "regulatory divide," Appellant's Br. 6–7, between the NRC and DOE under which prime-DOE contractors are exempt from NRC licensing requirements for work performed at DOE sites owned by the government, *see* 42 U.S.C. § 2140(a); 10 C.F.R. §§ 30.12, 40.11, 70.11. SAIC also highlights statements made at public meetings by NRC personnel confirming that the NRC lacks licensing authority over work performed at DOE facilities. SAIC dismisses the probative value of other conflicts alleged by the government, such as Vice President Motl's participation in ARMR, calling it "manifestly absurd to assert that SAIC intentionally or recklessly made false certifications of conflict-of-interest compliance" on the basis of a single employee's membership in a trade association. Appellant's Br. 41.

To be sure, record evidence does support SAIC's contention that any false certifications the company made resulted from reasonable mistakes. The record, however, also

supports a contrary view. For example, trial testimony could support a jury conclusion that SAIC employees knew that the company, in violation of NRC conflict of interest regulations to which it certified compliance, was "providing consulting assistance" to organizations "regulated by the NRC" on issues relating to the recycling and clearance of radioactively contaminated materials that were the subject of SAIC's work for the NRC. *See* 41 C.F.R. § 20-1.5403(b)(1)(i)–(ii) (1979). Specifically, several employees acknowledged at trial that British Nuclear and MSC intended to sell materials recycled from DOE's Oak Ridge facility and that such contaminated materials would be subject to NRC regulation once released into general commerce. As the district court found, such evidence "could tend to discredit SAIC's argument that its alleged false statements were the result of its belief that the entities with which it had relationships were entities wholly excluded from NRC regulation," and could instead permit "reasonable jury inferences that SAIC knew that it had relationships with entities . . . that were subject to the regulations of the NRC, regardless of whether these entities were doing other work for the DOE excluded from the NRC's regulatory authority." *Science Applications II*, 653 F. Supp. 2d at 96–97. Public statements by NRC officials on which SAIC relies do nothing to undermine this inference. Those officials stated that because the NRC regulated neither DOE itself nor DOE facilities, none of NRC's conflict of interest policies applied to DOE. That fact, however, is entirely undisputed. Moreover, at one of the public meetings SAIC references, an NRC official acknowledged that although the NRC had no regulatory authority over DOE's decision to release recycled materials from its facilities, it would acquire jurisdiction over the materials were they to enter NRC-licensed facilities.

The jury also could have concluded that SAIC employees knew that either the company or its employees had other relationships that placed SAIC in a conflicting role that might have biased its judgment. *See* 41 C.F.R. § 20-1.5403(b)(1)(iv) (1979). For example, some employees knew of the significant overlap between, on the one hand, SAIC's work for Bechtel Jacobs, which involved dose assessments for contaminated scrap metal at DOE's Oak Ridge buildings and cost-benefit analysis of the recycling of those materials, and, on the other, SAIC's work for the NRC. *See Science Applications II*, 653 F. Supp. 2d at 101 (summarizing testimony by several SAIC employees). And contrary to SAIC's argument, the jury could have given some weight to the participation of the company's Vice President in ARMR. Although SAIC seeks to minimize the relevance of this membership, it overlooks the fact that the Vice President functioned as more than just a member of the organization; instead, he served as an officer and board member who "played an active part in ARMR's advocating for a standard governing release or recycle of radioactive material." *Id.* Given that role, the jury was entitled to conclude that the Vice President or others aware of his membership knew or recklessly failed to know that his simultaneous work for the NRC on the same subject matter created a potential conflict of interest that the company was obligated to disclose.

Reviewing the record in its entirety and considering, as we must, all evidence in the light most favorable to the government, *see Smith v. Wash. Sheraton Corp.*, 135 F.3d 779, 782 (D.C. Cir. 1998), we conclude that record evidence is sufficient to have allowed the jury to reasonably believe that SAIC knowingly submitted false claims for payment and made false statements of compliance with the organizational conflict of interest requirements set forth in its NRC contracts.

*Breach of Contract*

For the same reasons, SAIC's argument for judgment as a matter of law as to the government's breach-of-contract claim necessarily fails. The record was sufficient to permit the jury to find that SAIC breached its obligations both to avoid potential conflicts and to disclose any that arose during the course of performance.

## III.

We next consider SAIC's alternative contention that we must vacate and remand for a new trial because the district court's "collective knowledge" instruction was both erroneous and prejudicial. Over SAIC's objection, the district court instructed the jury that corporations are "liable for the collective knowledge of all employees and agents within the corporation so long as those individuals obtained their knowledge acting on behalf of the corporation." Trial Tr. at 17 (July 28, 2008). The court continued:

> Therefore, if a corporation has many employees or agents, you must consider the knowledge possessed by those employees and agents as if it was added together and combined into one collective pool of information. If that collective pool of information here gives a reasonably complete picture of . . . false or fraudulent claims or false statements, you may find that SAIC itself possessed a reasonably complete picture of the false or fraudulent claims or false statements and acted knowingly.

*Id.* The district court then juxtaposed the possibility of inferring corporate knowledge based on "collective knowledge" with an alternative, i.e., establishing corporate scienter based on the state of mind of individual employees.

Specifically, it instructed the jury that it could find that SAIC "acted knowingly" if it determined that

> at least one individual employee of SAIC had actual knowledge of an organizational conflict of interest that contradicted SAIC's statements and claims that were made and presented to the NRC, or . . . that the individual employee acted in deliberate ignorance or in reckless disregard of such information. . . . This individual need not have been an employee who actually submitted certifications or claims to the NRC.

*Id.*

SAIC and one of its amici argue that the "collective knowledge" component of this instruction improperly allowed the government to prove FCA liability without having to demonstrate that any particular SAIC employee knew that the company's claims were false or that SAIC employees acted in deliberate ignorance or reckless disregard of their truth or falsity. Whether the district court's instruction is consistent with the FCA's scienter requirement presents a question of law that we review de novo. *See United States v. Orenuga*, 430 F.3d 1158, 1166 (D.C. Cir. 2005). Under the harmless error rule, we will vacate a judgment only if an instructional error "affected the substantial rights of the parties." *Williams v. U.S. Elevator Corp.*, 920 F.2d 1019, 1022 (D.C. Cir. 1990) (quotations and alterations omitted).

In non-FCA cases, we have expressed a good deal of skepticism about corporate intent theories that rely on aggregating the states of mind of multiple individuals. In *Saba v. Compagnie Nationale Air France*, 78 F.3d 664 (D.C. Cir. 1996), in which we held that the plaintiff had failed to establish that the defendant engaged in the "willful

misconduct" necessary to impose liability under Article 22 of the Warsaw Convention, we explained that though "negligent acts of employees can be fairly imputed to the corporation[,] [i]ndividual acts of negligence on the part of employees . . . cannot . . . be combined to create a wrongful corporate intent." *Id.* at 670 n.6. More recently, in *United States v. Phillip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009), we explained that "[l]ike . . . other courts, we are dubious of the legal soundness of the 'collective intent' theory," under which, as we explained, a corporation's specific intent to defraud can be inferred if the company's public statements contradict the accumulated "collective knowledge" of the corporation's employees. *Id.* at 1122. In contrast to these two non-FCA cases, Congress defined the FCA's scienter element to require "no proof of specific intent." *See* 31 U.S.C. § 3729(b). We nonetheless believe that under the FCA, "collective knowledge" provides an inappropriate basis for proof of scienter because it effectively imposes liability, complete with treble damages and substantial civil penalties, for a type of loose constructive knowledge that is inconsistent with the Act's language, structure, and purpose.

Congress established the FCA's scienter requirement when it amended the Act in 1986 "to clarify" that even absent evidence of specific intent to defraud, "defendants were subject to liability . . . if they had 'actual knowledge' of the falsity of their claims or acted with 'deliberate ignorance' or 'reckless disregard' of the truth or falsity of their claims." *TDC I*, 24 F.3d at 297–98 (quoting 31 U.S.C. § 3729(b)). According to the Senate Committee Report to the 1986 amendments, Congress adopted this definition of "knowingly" to capture the " 'ostrich-like' conduct which can occur in large corporations" where "corporate officers . . . insulate themselves from knowledge of false claims submitted by lower-level subordinates." S. Rep. No. 99-345, at 6

(1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272. That said, Congress clearly had no intention to turn the FCA, a law designed to punish and deter fraud, into a vehicle for either "punish[ing] honest mistakes or incorrect claims submitted through mere negligence" or imposing "a burdensome obligation" on government contractors rather than a "limited duty to inquire." *Id.* at 6, 19. The resulting statutory language demonstrates the care Congress took to balance competing objectives. Although Congress defined "knowingly" to include some forms of constructive knowledge, its definition of that term imposes liability for mistakenly false claims only when the defendant deliberately avoided learning the truth or engaged in aggravated gross negligence. *See United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (equating "reckless disregard" with "aggravated gross negligence"); *see also Wang v. FMC Corp.*, 975 F.2d 1412, 1420 (9th Cir. 1992) (explaining that although section 3729(b) of the FCA adopts a less exacting definition of scienter than common law fraud, "innocent mistakes" and "negligence" remain defenses under the Act).

Lacking such balance and precision, the "collective knowledge" theory allows "a plaintiff to prove scienter by piecing together scraps of 'innocent' knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claim seeking government funds." *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 918 n.9 (4th Cir. 2003). In other words, even absent proof that corporate officials acted with deliberate ignorance or reckless disregard for the truth by submitting a false claim as the result of, for instance, a communication failure, the fact-finder could determine that the corporation knowingly submitted a false claim. In this case, the district court's instruction goes even further, drawing no distinction

between the knowledge of corporate officers and that of potentially thousands of ordinary employees, including the knowledge of all employees in the "collective pool" of information imputed to the corporation. The district court's instruction thus allowed the jury to find that SAIC knowingly submitted false claims for payment even if the jury also concluded (1) that no individual at SAIC was simultaneously aware (or was recklessly unaware) of the company's NRC contract and its relationships with other companies involved in the recycling of radioactive materials, and (2) that SAIC, acting on the basis of the knowledge of its individual employees, took reasonable steps to identify potential conflicts.

We know of no circuit that has applied the "collective knowledge" theory to the FCA. Indeed, in a closely analogous case involving claims that were legally false because of undisclosed conflicts of interest, the Fourth Circuit recognized the theory's troubling implications for FCA liability. *See Harrison*, 352 F.3d at 918 n.9.

Defending the district court's instruction, the government relies primarily on *United States v. Bank of New England*, 821 F.2d 844 (1st Cir. 1987), in which the First Circuit held in a non-FCA case that a collective knowledge instruction was "entirely appropriate." *Id.* at 856. That case is easily distinguishable. First, as we explained in *Saba*, although the First Circuit in *Bank of New England* allowed the jury to infer corporate knowledge of facts through the accumulation of individual knowledge, proof of "the proscribed intent" in that case "depended on the wrongful intent of specific employees." *Saba*, 78 F.3d at 670 n.6. By contrast, the "collective knowledge" instruction in this case gave the jury an alternative basis for finding the requisite scienter. Second, and more important, the First Circuit's justification for the

"collective knowledge" theory has no applicability here. There the court concluded that in the context of corporate criminal liability, the trial court's "collective knowledge" instruction "was not only proper but necessary" to prevent corporations from evading liability by "compartmentaliz[ing] knowledge, subdividing the elements of specific duties and operations into smaller components." *Bank of New England*, 821 F.2d at 856. This "compartmentalization" problem, however, is exactly what Congress had in mind when it defined "knowing" and "knowingly" in the 1986 FCA amendments. Under the FCA, if a plaintiff can prove that a government contractor's structure prevented it from learning facts that made its claims for payment false, then the plaintiff may establish that the company acted in deliberate ignorance or reckless disregard of the truth of its claims. But if the plaintiff in such a scenario fails to prove that the corporation acted with deliberate ignorance or reckless disregard, then no liability may attach under the FCA's plain language.

Even though the government relied on the "collective knowledge" theory throughout the proceedings in the district court and repeatedly invoked it in closing arguments to the jury, *see* Trial Tr. 48–50 (July 28, 2008), it nonetheless claims that any instructional error was harmless because "the jury . . . could find that SAIC had the requisite scienter here wholly apart from [the] collective knowledge rubric." Appellee's Br. 42. We agree that the jury, relying entirely on evidence of actual knowledge possessed by individual company employees, could have found that SAIC knowingly submitted false claims and made false statements. Alternatively, relying on evidence regarding the actions of employees or SAIC's systems and structure, the jury could also have concluded that the company acted recklessly or with deliberate ignorance of the truth. For example, as noted above, record evidence suggests that some employees who knew about SAIC's

organizational conflict of interest obligations to the NRC were also aware of the company's business relationships with British Nuclear, MSC, and Bechtel Jacobs. *See supra* at 20-21. If the jury found that these individuals knew or recklessly failed to know that SAIC, by having these conflicts and failing to disclose them, violated a requirement under its NRC contract that was material to the receipt of payment, then that finding would be enough to establish SAIC's scienter.

The harmless error standard, however, demands more than a counterfactual assessment of what verdict the jury might have reached without relying on the offending instruction. In order to find that the error had no effect on SAIC's substantial rights, we would have to be able to say " 'with fair assurance[] that the judgment was not substantially swayed by the error.' " *Williams*, 920 F.2d at 1022–23 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (internal alterations omitted)). This we cannot do, for the "collective knowledge" instruction may have misled the jury into believing that the standard for knowledge under the FCA is lower for corporate defendants. That is, the jury might have concluded that SAIC acted knowingly, as defined in the challenged instruction, if the company could have or should have realized it had potential conflicts based on the "collective pool of information," Trial Tr. at 17 (July 28, 2008), derived from all of its individual employees. As a result, even though the jury might well have accepted SAIC's arguments that its compliance system was generally adequate and that individual employees with knowledge of the company's conflicting business relationships honestly and reasonably believed that these relationships created no potential conflicts, it still might have concluded based on the company's "collective knowledge" that SAIC knew about the conflicts (and by extension knew that its express

representations and implied certifications of compliance were false).

To be sure, the district court did instruct the jury that for the government to satisfy its burden of proof, "more than an honest mistake or mere negligence [on the part of SAIC] must be found." *Id.* at 16. But by providing an alternate route to proof of scienter, the "collective knowledge" instruction undermined the clarity of this separate "no mere negligence instruction" and allowed the jury to impose liability for what is essentially negligence or mistake by another name. Given the essential role that proof of scienter plays under the FCA, and given our lack of confidence that the jury here based its verdict on the proper legal standard, we decline to affirm on the ground that the error was harmless. This is especially so in view of the fact that we must be sure, as we explained above, that liability in this implied certification suit attaches only for fraud and not for ordinary breach of contract. *See supra* at 22–23. We shall thus vacate the judgment for the government with respect to its two FCA causes of action.

Given the foregoing, we have no need to address SAIC's challenges to other instructions with respect to its FCA liability save for one that is also relevant to the breach of contract verdict. SAIC argues that the district court erred by failing to instruct the jury as to the meaning of the phrase "regulated by the Nuclear Regulatory Commission"—key language that appears in two of the conflict of interest "situations or relationships" described in NRC regulations, 41 C.F.R. § 20-1.5403(b)(1)(i)–(ii) (1979). But even assuming that the district court should have defined this phrase for the jury, we see no prejudice to SAIC. As the district court explained in its post-trial opinion, "the term 'regulated by the NRC' does not carry a specialized definition under the NRC regulations, and the jury was adequately informed of the

ordinary definition of 'regulated by the NRC' throughout trial." *Science Applications II*, 653 F. Supp. 2d at 110. That ordinary definition, as SAIC's former employee acknowledged in his testimony, simply equated "regulated by NRC" with "subject to the regulations of NRC." Trial Tr. at 50 (July 3, 2008 (P.M.)) (testimony of Thomas Rodehau). We thus have no reason to believe that the jury was left "free to speculate about the meaning of this legal phrase." Appellant's Br. 50. Accordingly, we shall affirm the judgment as to the breach of contract claim.

## IV.

This brings us finally to SAIC's challenges to the jury's award of damages. Recall that the jury awarded the government FCA damages of $1,973,839.61, which the district court then trebled and combined with an additional $577,500 in civil penalties. Given our decision to vacate the judgment and remand as to the government's FCA claims, we have no need to reach the company's argument that the award violates the Eighth Amendment's Excessive Fines Clause. *See Krizek*, 111 F.3d at 940 (declining to reach the defendant's Excessive Fines Clause argument after vacating on other grounds "in keeping with the principle that courts should avoid unnecessarily deciding constitutional questions"). But given our remand and in the interest of judicial economy, we shall consider SAIC's arguments (1) that the government failed to prove that it suffered any actual FCA damages and (2) that the district court's damages instruction was erroneous.

The FCA "imposes two types of liability." *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005). First, a defendant who submits a false claim or makes a false statement to get a false claim paid is liable for civil penalties regardless of whether the

government shows that the submission of that claim caused the government damages. *See id.* Second, the defendant is liable for "3 times the amount of damages which the Government sustains because of the act of [the defendant]." 31 U.S.C. § 3729(a). SAIC's two arguments focus only on the award of damages.

SAIC contends that notwithstanding any technical violations of the company's conflict of interest obligations, the government is entitled to no damages because it received the full value of the services covered by the contract. This is so, SAIC says, because it not only "delivered . . . all the work product that it promised to deliver under its NRC contracts" but also because reviewing NRC officials "uniformly praised" that work product. Appellant's Br. 54. As the government points out, however, SAIC's NRC contract obligated the company to provide "advice and assistance that was both technically sound *and* free from potential bias." Appellee's Br. 46. As a result, a jury could rationally conclude that no matter how technically proficient SAIC's performance, the value of that performance to the NRC was compromised by the appearance of bias created by the company's failure to live up to its contractual conflict of interest obligations. The jury could therefore award FCA damages for any loss in value to the NRC attributable to SAIC's failure to provide the completely impartial conflict-free services required by the NRC contracts. *See TDC II*, 288 F.3d at 428 ("[T]he evidence allowed the district court to find that the value of the 'best efforts' provided by TDC was vitiated by TDC's fraudulent concealment of its rent-seeking behavior.").

We nonetheless agree with SAIC that the district court's damages instruction was flawed. The district court began by describing the standard for causation, informing the jury that "[t]he damages that the United States is entitled to recover

under the False Claims Act are the amount of money that the government paid out by reason of the false claims over and above what it would have paid out had SAIC not made the false claims." Trial Tr. at 21 (July 28, 2008). So far so good. But the court went on to provide the following additional guidance:

> Your calculations of damages should be limited to determining what the Nuclear Regulatory Commission paid to [SAIC] over and above what the NRC would have paid had it known of SAIC's organizational conflicts of interest. Your calculation of damages should not attempt to account for the value of services, if any, that SAIC conferred upon the Nuclear Regulatory Commission.

*Id.* at 21–22. By requiring the jury to "limit[]" its calculation of damages to the government's payments, the instruction compelled the jury to assess as damages the actual amount of payments the government made to SAIC. This automatic equation of the government's payments with its damages is mistaken.

In calculating FCA damages, the fact-finder seeks to set an award that puts the government in the same position as it would have been if the defendant's claims had not been false. *See United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 904 (D.C. Cir. 2010); *Harrision*, 352 F.3d at 922–23. In a case where the defendant agreed to provide goods or services to the government, the proper measure of damages is the difference between the value of the goods or services actually provided by the contractor and the value the goods or services would have had to the government had they been delivered as promised. Proper application of this benefit-of-the-bargain measure depends on the particular

circumstances of the case. Where a contractor's fraud consists of knowingly submitting nonconforming goods with ascertainable market value, the Supreme Court has instructed that "[t]he Government's actual damages are equal to the difference between the market value of the [product] it received and retained and the market value that the [product] would have had if [it] had been of the specified quality." *United States v. Bornstein*, 423 U.S. 303, 316 n.13 (1976). But if the value that conforming goods or services would have had is impossible to determine, then the fact-finder bases damages on the amount the government actually paid minus the value of the goods or services the government received or used. *See* Joel M. Androphy, *Federal False Claims Act & Qui Tam Litigation* § 11.03[2] (2009).

Under this benefit-of-the-bargain framework, the government will sometimes be able to recover the full value of payments made to the defendant, but only where the government proves that it received no value from the product delivered. *See Harrison*, 352 F.3d at 923 & n.17 (denying plaintiff's claim for disgorgement of the government's total contract payments but recognizing that "factual scenarios could exist in which the contractor's performance so lacks any value as to make recovery of all monies paid by the government an appropriate remedy"); *TDC II*, 288 F.3d at 428 ("Once TDC deviated from its contracted role as impartial ombudsman . . . the district court . . . could properly find that the Program no longer had *any value* to the government." (emphasis added)); *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 197–98, 200 (D.C. Cir. 1995) (holding that payments for computer software system components induced by false representations in a contractor's progress reports could constitute FCA damages where the individual components were supposedly "worthless on their own"). In some cases, such as where the defendant

fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable as damages. *See TDC II*, 288 F.3d at 428; *see also United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 473 (5th Cir. 2009) (calculating damages as the amount the government paid to the defendants where "[t]he contracts entered . . . did not produce a tangible benefit" to the government and were instead part of a grant program designed to award money to deserving small businesses); *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (concluding that the defendant, who submitted false claims for Medicare and Medicaid payments, was required to repay the full amount of the claims as damages because the defendant "did not furnish any medical service to the United States," and instead effectively sought a government subsidy to which it was not entitled). Here, however, the damages instruction essentially required the jury to assume that SAIC's service had no value even in the face of possible evidence to the contrary. To establish damages, the government must show not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, but also that the performance the government received was worth less than what it believed it had purchased.

Because SAIC's services under its NRC contract had no ascertainable market price, the district court should instruct the jury to calculate the government's damages by determining the amount of money the government paid due to SAIC's false claims over and above what the services the company actually delivered were worth to the government. Of course, the government remains free to argue that the value of SAIC's advice and assistance was completely

compromised by the existence of undisclosed conflicts, making the full amount paid to SAIC the proper measure of damages. SAIC, however, must also be allowed to offer evidence to the contrary, such as evidence about the technical quality of its work, the fact that the NRC continued to use SAIC's work product after the potential conflicts were identified and the 1999 contract was terminated, and testimony by NRC's project manager that SAIC's actual work product "constituted the opposite of a conflict," Trial Tr. at 9–10 (July 3, 2008 (P.M.)) (testimony of Dr. Robert Meck), due to its transparency and fairly conservative results.

We recognize the difficulty the jury will face in calculating the value of services tainted by potential conflict, although the district court's breach of contract instruction asked the jury to make just such a valuation. *See* Trial Tr. at 24 (July 28, 2008). The government, however, bears the burden of proving damages, *see* 31 U.S.C. § 3731(d), and we see no basis for adopting an irrebuttable presumption—essentially what the government seeks—that treats services involving expert advice and analysis affected by potential organizational conflicts as categorically worthless.

## V.

We affirm the district court's denial of SAIC's motion for judgment as a matter of law, as well as its judgment as to both liability and damages on the government's claim for breach of contract. With respect to the judgment as to liability and damages under FCA sections 3729(a)(1) and 3729(a)(2), we vacate and remand for further proceedings consistent with this opinion.

*So ordered.*